### In re LOUISIANA–PACIFIC INNER–SEAL SIDING LITIGATION.

### Civil No. 95–879–JO (LEAD).

United States District Court,
D. Oregon.

Dec. 13, 2002.

James Volling, Jason ·K. Walbourn, Faegre & Benson LLP, Minneapolis, MN, Kell M. Damsgaard, Brian W. Shaffer, Morgan Lewis & Bockius LLP, Philadelphia, PA, Jennifer K. Oetter, Hoffman Hart & Wagner LLP, Portland, OR, for Lester Building Systems.

Christopher I. Brain, Tousley Brain Stephens PLLC Seattle, WA, Co–Lead Class Counsel.

Michael H. Simon, Perkins Coie LLP, Portland, OR, James K. Langdon II, Edward B. Magarian, Dorsey & Whitney LLP, Minneapolis, MN, for Louisiana–Pacific Corporation.

## OPINION, ORDER, AND PERMANENT INJUNCTION

ROBERT E. JONES, District Judge.

This case is before the court on Louisiana–Pacific's ("LP") motion (# 558) to enforce class action settlement (Minnesota). LP seeks an injunction to prevent entry of judgment against LP and in favor of Lester Building Systems and Lester's of Minnesota, Inc. (collectively, "Lester"), on a portion of a Minnesota state çourt jury verdict that, according to LP, awards damages encompassed by and precluded by the Order, Final Judgment and Decree this court entered on April 26, 1996, approving and implementing a nationwide class action settlement in the above-captioned case.

On December 10, 2002, I held a hearing on LP's motion. Counsel for LP and Lester appeared and argued. After arguments, I asked counsel for LP to prepare and submit a proposed statement of predicate facts for the requested relief, and took LP's motion under advisement. On De-

cember 11, 2002, the court received LP's submission, and on December 12, 2002, received Lester's objections.

After thoroughly considering the written submissions and arguments of counsel, I am convinced that the injunction LP requests is appropriate and necessary in aid of this court's jurisdiction and to effectuate the class action settlement. Accordingly, I grant LP's motion and enter an injunction enjoining the Minnesota state court from entering judgment on the portion of the jury's damages award that is encompassed in and precluded by the class action settlement agreement, as set forth below.

### FACTUAL BACKGROUND

1. *The Settlement Agreement and the Order, Final Judgment and Decree*

On April 26, 1996, this court entered its Order, Final Judgment and Decree ("Order") approving the nationwide class action settlement in this consolidated action. Affidavit of James K. Langdon II ("Langdon Aff."), Ex. 1.

The Order defines the "Class" as "[a]ll persons who have owned, own, or subsequently acquire Property on which [LP siding] has been installed prior to January 1, 1996 * * *." Langdon Aff., Ex. 1, p. 2 n. 2. The Order states that "all members of the Class who do not file timely notices of exclusion release are barred and permanently enjoined from prosecuting 'Settled Claims' * * * against L–P * * *." Ex. 1, p. 5.

The Settlement Agreement, as amended, defines "Settled Claim" to mean

any claim, * * * damage, loss or cost, action or cause of action, of every kind and description that the Releasing Party [as defined] has or may have, whether known or unknown, asserted or unasserted, latent or patent, that is, has been, could reasonably have been or in the future might reasonably be asserted by the Releasing Party either in the Action or in any other action or proceeding in this Court or any other court or forum, regardless of legal theory, and regardless of the type or amount of relief or damages claimed, against any of the Defendants, arising from or in any way relating to any defects or alleged defects of [LP siding], or any part thereof.

Langdon Aff., Ex. 2, p. 5. "Settled Claim" does not include claims arising from the installation of new siding after January 1, 1996. Langdon Aff., Ex. 2, p. 6.

The Settlement Agreement also contains a release of all claims against persons or entities, including contractors such as Lester, in the chain of distribution, installation, or finishing of LP siding. Langdon Aff., Ex. 2, p. 23.

The Settlement Agreement deals specifically with the period after January 1, 2003. Paragraph 4.9 of the Settlement Agreement provides that if at the end of the seven year period, funds are insufficient to satisfy in full all approved claims filed before January 1, 2003, then the Claims Administrator is to notify LP within 60 days. Within 60 days of notification, LP is to advise class counsel whether it will satisfy the remaining unfunded claims. If it decides to do so, LP must make additional payments into the fund "at the end of each of the next two 12–month periods or until all claims are paid in full." Langdon Aff., Ex. 2, p. 11. If LP elects to continue funding, then "all class members are bound by this Agreement for an additional 24–month period." *Id.* Finally, if LP should fail to make the additional payments, then all class members whose claims remain unsatisfied for a period of 90 days may then "pursue whatever legal

remedies are available to them without regard to the release * * *." *Id.*

The Order further provides:

[T]he Court shall retain exclusive and continuing jurisdiction over the Actions and Parties, including all members of the Class, the administration and enforcement of the settlement, and the benefits to the Class, including for such purposes as supervising and implementation, enforcement, construction, and interpretation of the Settlement Agreement.

Langdon Aff., Ex. 1, p. 6. Similarly, the Settlement Agreement provides that "[t]he Court shall retain exclusive and continuing jurisdiction of the Action, all Parties and Settlement Class members, to interpret and enforce the terms, conditions, and obligations of this release." Langdon Aff., Ex. 2, p. 22.

### 2. *Lester's Minnesota Claims*

On May 11, 2000, Lester filed a complaint in the McLeod County District Court for the State of Minnesota, styled *Lester Building Systems and Lester's of Minnesota, Inc. v. Louisiana–Pacific Corporation and Canton Lumber Company,* Case No. 43–C6–00–000335 (McLeod County, MN District Court). Langdon Aff., Ex. 3.

As relevant to the present motion, in an amended complaint ("Complaint") filed in August 2002, Lester alleges that it purchased LP siding from 1991 to 1996. Langdon Aff., Ex. 4, ¶ 15. "During the same time period, [Lester] sold directly to end users the [siding] as part of the insul-wall panels and otherwise in the building systems." *Id.* Lester sold products made with LP siding for use in approximately 2600 buildings. Langdon Aff., Ex. 4, ¶ 34.

Lester stopped purchasing LP siding in 1996. Langdon Aff., Ex. 4, ¶ 27. Lester worked with LP to resolve customer complaints concerning failed siding from 1996 until September 1998. Langdon Aff., Ex. 4, ¶¶ 29, 32. Lester alleged that it "has received and will continue to receive hundreds of complaints * * * which must be administered and resolved in order to avoid further losses * * *." Langdon Aff., Ex. 4, ¶¶ 63 (misrepresentation claim), 136 (indemnity claim).

Under Count XIV, Lester sought declaratory relief concerning the class action settlement, specifically, a declaration that

in order to avoid further loss to Plaintiffs, L–P is obligated and required: (i) to pay, reimburse, and indemnify Plaintiffs for all monies they pay and expenses they reasonably incur in properly satisfying the claims of their dealers and customers arising from defects in and failure of L–P's [siding]; * * *.

Langdon Aff., Ex. 4, ¶ 153.

In the prayer, Lester sought, as relevant, damages "in an amount to be determined at trial," and "an affirmative injunction requiring L–P to resume honoring its warranties and other legal obligations, including, but not limited to reimbursing Plaintiffs for satisfying the claims of Plaintiffs' dealers and customers * * *." Langdon Aff., Ex. 4, p. 34.

LP moved for partial summary judgment shortly before trial, seeking dismissal of all claims against LP for known, unresolved Inner–Seal® claims and all claims for future, unknown Inner–Seal® claims related to hog barns built during the period 1991–1995. In the alternative, LP moved to exclude testimony about such claims at trial. The judge denied both motions. Langdon Aff., Ex. 6, pp. 1–4.

### 3. *The State Court Trial*

Trial in Minnesota state court was held from September 24, 2002 through October 14, 2002. Langdon Aff., Ex. 12. During

trial, a witness, Vance Thomas, testified that based on a comparison of the list of opt-outs and a list of Lester barn purchasers, no barn purchasers had opted out of the nationwide class action settlement. Langdon Aff., Ex. 5, pp. 4–5.

Lester presented testimony from its damages expert Donald Gorowsky that it would cost $13.2 million to repair the LP siding on all of the buildings that Lester built from 1991 through 1996. According to Gorowsky, Lester paid $3.4 million for the siding purchased during that time period. Langdon Aff., Ex. 8, pp. 2–3, 10. Gorowsky testified that

> [a]ll of the buildings that were built from 1991 through 1996 that were sold into the hog industry or hog market and a few others that have been sold in this area, like for horses and dairy that have Inner–Seal on them, * * * the amount it will take to repair them less the ones that were sold without a warranty on the Inner–Seal and determined that it will take thirteen point two million dollars to repair those about 2600 remaining buildings.

Langdon Aff., Ex. 8, p. 3. Gorowsky explained that

> [w]e did a verification test to be satisfied with the quantity of Inner–Seal, the square footage that was contained on those 2632 buildings; how much of that is on there and the cost that it will take to repair and replace those buildings.

Id., p. 4. Continuing to explain how he calculated the cost to repair, Gorowsky stated:

> For the building repairs that were made it's just under $200,000.00 or point two million. For the building repairs known to be needed it's estimated at one point five million and for the building repairs to be required for that 2407 buildings

it's eleven point five million. All of those together equals thirteen point two that you saw as my first category on the earlier slide * * *.

Id., pp. 3–5.

On redirect, the following colloquy between Gorowsky and Lester's counsel took place:

> Q  Now one other question about the class action. We've heard comment that the class action does not include buildings built after January 1, 1996. On your calculation *what is the cost of repairing buildings after January 1, 1996?*
>
> A  *There's approximately 409 buildings that were in my claim built after January 1, 1996,* and the square footage for those building s and *the cost to repair or replace the Inner–Seal comes to just over two million dollars.*

Langdon Aff., Ex. 8, p. 8 (emphasis added).[1]

The testimony of Lester's president, John Hill, clarified that Lester sought damages to repair and replace LP siding covered by the class action settlement:

> A About the best thing we could expect to come out of this is that we finally get to the farmer what he's entitled to, which is he bought a building and expected to have his siding hold up, and that's what we need to make happen and that's why we're here. We're trying to make that result happen.
>
> Q  If Lester's prevails what's it going to do with the money?
>
> A *I want each of you to know that we're going to fix these buildings. That's why we're here.* Counsel in some of the lead up to trial has at least left me with some kind of general impression that, you know, is there any guarantee

---

1.  LP is not seeking relief regarding the $2 million repair cost estimate for buildings built after January 1, 1996, only the balance of $11.2 million in repair costs.

that the customer will be taken care of here? And I would ask you to look at all the different people from Lester and its dealers that you've got a chance to meet over the last two weeks and *know that we're here because we want to fix these buildings and that's what we're going to do.*

Langdon Aff., Ex. 9, pp. 2–3 (emphasis added).

LP moved for directed verdict at the close of Lester's case on the warranty claims, indemnity claims, and as particularly relevant here, "in regard to the class action." Langdon Aff., Ex. 10, pp. 1–2. The judge denied the motion, reasoning as follows:

Defendant [LP] argues that a directed verdict should be entered in regard to the indemnity claim. This is premature and untimely and need not be addressed until all the evidence is received. This claim rises and falls on the interpretation of the applicability of the class action mechanism for the recovery of the end user and that has not been determined yet. * * *

Defendant [LP] argues that a directed verdict should be entered in regard to the class action. This is premature and untimely and cannot be decided until all evidence is submitted since the Defendant may be submitting expert testimony concerning the mechanics of the class action.

Langdon Aff., Ex., p. 4.[2]

4. *The Court's Jury Instructions and the Verdict*

At the end of trial, the Minnesota state court instructed the jury, in part, as follows:

EFFECTS OF CLASS ACTION SETTLEMENT

You have heard evidence of the settlement of a nationwide class action against Louisiana–Pacific. Lester is not a party to that action and therefore the claims that it makes in this case are not barred by the class action settlement. The Court has determined, however, that *one element of Lester's damages, its claims for the cost to repair the buildings with InnerSeal, is barred as to any particular building, unless one of the following exceptions applies:*

(a) the building was constructed on or after January 1, 1996;

(b) the building has or may have a siding performance failure after January 1, 2003; or

(c) the building is one for which claims are submitted prior to January 1, 2003, have not been paid and the class action is not funded in August 2003.

Langdon Aff., Ex. 11, pp. 23–24 (emphasis added).

On October 15, 2002, the jury returned its verdict. After finding against LP on claims for breach of express warranty, breach of implied warranty, fraud and misrepresentation, breach of contract, and promissory estoppel,[3] the jury made the following damages awards:

| | |
|---|---|
| Cost of Inner–Seal: | $ 3.4 million |
| Cost to Repair Buildings (those not barred by the class action): | $13.2 million |
| Lost Profits: | $10.2 million |
| Cost to Restore Goodwill: | $ 2.8 million |

2. According LP's Minnesota trial counsel, LP was not required to renew the motion for directed verdict at the close of evidence to preserve the issues raised. Lester's counsel did not dispute this.

3. The verdict contained no separate finding for the indemnity claim.

In question No. 9 of the verdict form, the jury was asked: "Without regard to the class action, what is the total amount of money that would fairly and adequately compensate Lester for the Cost to Repair Buildings (both those in and out of the class action)?" The jury responded: "$13.2 million." Langdon Aff., Ex. 12, pp. 3–4. In other words, the jury determined that *none* of the cost to repair was barred by the class action.

### 5. *Current Status*

LP has filed post-trial motions in the Minnesota case. On November 18, 2002, the Minnesota state court granted LP's motion to stay entry of judgment, "not merely for 30 days but additionally until the court has heard and determined post-trial motions." *Lester Building Systems and Lester's of Minnesota, Inc. v. Louisiana–Pacific Corporation and Canton Lumber Company*, Case No. 43–C6–00–000335 (Order, Yost, J.). Declaration of Michael H. Simon (filed November 27, 2002), Ex. A. The hearing on LP's post-trial motions is scheduled for December 16, 2002.

Thus, judgment has not yet been entered in the Minnesota state court action.

## FINDINGS AND CONCLUSIONS

Lester asserts several arguments in opposition to LP's motion. These are: (1) The court lacks personal jurisdiction over Lester; (2) the court lacks subject matter jurisdiction to grant the requested relief; (3) Lester is not a class member, is not an agent for any class members, and is entitled, under Minnesota law, to recover its costs to repair defective siding; (4) the *Rooker–Feldman* doctrine bars the requested relief; (5) the Full Faith and Credit Act bars the requested relief; (6) depriving Lester of the jury verdict vio-

lates due process; and (7) equity favors Lester.

I will address the preliminary matters of jurisdiction first, before I turn to the merits of the controversy. *See In re Diet Drugs*, 282 F.3d 220, 229 (3rd Cir.2002).

### 1. *Personal Jurisdiction*

■ Lester challenges this court's personal jurisdiction, arguing that Lester was never "served" in this action. *See* Lester's Response to Louisiana–Pacific's Motion, p. 12. Service of process, however, is not required: "Injunctions may be issued against non-parties under the All Writs Act." *U.S. v. International Broth. of Teamsters*, 907 F.2d 277, 281 (2nd Cir. 1990); *see, e.g., In re Baldwin–United Corp.*, 770 F.2d 328, 338 (2nd Cir.1985)(All Writs Act grants authority to enjoin and bind non-parties to an action when needed to preserve court's ability to reach or enforce its decision in a case over which it has proper jurisdiction)(*citing,* among other cases, *United States v. New York Tel. Co.*, 434 U.S. 159, 174, 98 S.Ct. 364, 54 L.Ed.2d 376 (1977)). Where a court has jurisdiction over the subject matter of and the parties to the litigation, as here (see below), the All Writs Act authorizes the court to protect its jurisdiction "even though non-parties may be subject to the terms of the injunction." *International Broth.*, 907 F.2d at 281.

■ Moreover, the present proceeding does not " 'offend traditional notions of fair play and substantial justice.' " *In re Diet Drugs*, 282 F.3d at 230 (*quoting Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945)). Lester sought to recover relief in Minnesota that had, since 1996, been encompassed by the nationwide class action settlement. Under such circumstances, Lester should reasonably have anticipated being haled into this court. *See In re Diet Drugs*, 282 F.3d at

231 (where relief sought in Texas state court action was "squarely aimed" at a federal class action in Pennsylvania, plaintiffs in state court action should reasonably have anticipated being haled into federal court)(*quoting World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980)).[4]

### 2. Subject Matter Jurisdiction

Lester contends that this court lacks subject matter jurisdiction over the present motion. Lester is mistaken. The basis for jurisdiction is the court's express retention of jurisdiction as set forth in the Settlement Agreement and in the Order. *See Flanagan v. Arnaiz*, 143 F.3d 540, 544 (9th Cir.1998)("a basis for jurisdiction may be furnished 'by separate provision (such as a provision "retaining jurisdiction" over the settlement agreement) or by incorporating the terms of the settlement agreement in the order' ") (citation omitted); *see also California v. Randtron*, 284 F.3d 969, 974 (9th Cir.2002). This court has jurisdiction over the class action settlement and over LP, and consequently has subject matter jurisdiction to resolve LP's motion to enforce the settlement through an injunction directed to the Minnesota court.

In short, I conclude that this court has both personal jurisdiction over Lester and subject matter jurisdiction to resolve the present motion. I next turn to the merits of the controversy.

### 3. Lester's Claims in the Minnesota Action

■ No one disputes that Lester is not a class member. Lester contends that in seeking repair costs, it was not acting as an agent for class members. While Lester may not have been engaged as a formal agent for its end user customers, Lester's president's trial testimony plainly demonstrates that Lester was, in fact, seeking to recover repair costs for the end user customers, *i.e.*, Lester was asserting damages claims that belonged to the end users. Even the Minnesota court understood this to be the nature of Lester's cost to repair claim. *See* the court's jury instruction entitled "EFFECTS OF CLASS ACTION SETTLEMENT," set forth above.

Lester argues, however, that under Minnesota law the recoverable damages for a defective product include the cost to repair the defective product. Lester cites two cases, *DeGidio v. Ace Eng. Co.*, 302 Minn. 19, 225 N.W.2d 217 (1974), and *Ag–Chem Equip. v. Ceram–Traz Corp.*, 1996 WL 229263 (Minn.App.1996), in support of this proposition. I have studied these cases carefully and find them to be readily distinguishable and thus not controlling. Neither *DeGidio* nor *Ag–Chem* involved factual or legal circumstances similar to those presented here, where the buyer of the defective product, Lester, has been released from liability for repair and replacement of defective siding by its end user customers as part of a nationwide class action settlement. Thus, the risk of the buyer's potential liability to unhappy customers envisioned by the *DeGidio* and *Ag–Chem* courts does not exist under the circumstances presented here.

Consequently, I find and therefore conclude that the Minnesota jury verdict

---

4. I note that Lester itself sought this court's assistance in June 2002, albeit unsuccessfully, by filing a petition to intervene (# 543) for the purpose of obtaining discovery taken pursuant to the protective order in this case. Defendants Merlo and LP opposed the petition (## 545, 548). Special Master Judge Richard Unis held a hearing on Lester's petition in July 2002, and on July 22, 2002, denied the petition. Thus, Lester itself invoked this court's jurisdiction.

wrongly includes damages expressly encompassed in and precluded by the nationwide class action settlement.

### 4. *This Court's Authority to Issue the Requested Injunction*

Lester next contends that the Anti–Injunction Act, 28 U.S.C. § 2283, prohibits this court from issuing the requested injunction. I have studied the authorities thoroughly and while mindful that a federal court should not lightly interfere in state court proceedings, conclude that issuance of an injunction is both authorized and necessary to protect the integrity of this court's Order, Final Judgment and Decree in the nationwide class action.

Under the All Writs Act, the court may "issue all writs necessary or appropriate in aid of [its] respective jurisdiction[ ] and agreeable to the usages and principles of law." 28 U.S.C. § 1651; *see Hanlon v. Chrysler Corporation*, 150 F.3d 1011, 1025 (9th Cir.1998). That power is limited by the Anti–Injunction Act, which generally prohibits federal courts from interfering with proceedings in state courts, unless the circumstances fall within one of three express exceptions:

> The * * * question is whether the circumstances of [the] case fall within one of the three exceptions to the Act—injunctions that: (1) Congress has expressly authorized; (2) are necessary in aid of the federal court's jurisdiction; or (3) are necessary to protect or effectuate the federal court's judgments.

*Bennett v. Medtronic, Inc.*, 285 F.3d 801, 805 (9th Cir.2002).

The Supreme Court has cautioned that the exceptions are to be narrowly construed and " 'should not be enlarged by loose statutory construction.' " *Bennett*, 285 F.3d at 805 (*quoting Atlantic Coast Line R.R. Co. v. Bhd. of Locomotive Eng'rs*, 398 U.S. 281, 287, 90 S.Ct. 1739, 26 L.Ed.2d 234 (1970)). " 'Any doubts as to the propriety of a federal injunction against state court proceedings should be resolved in favor of permitting the state courts to proceed in an orderly fashion to finally determine the controversy.' " *Bennett*, 285 F.3d at 805 (*quoting Atlantic Coast*, 398 U.S. at 297, 90 S.Ct. 1739). That an injunction *may* issue under the Anti–Injunction Act does not mean that it must; the decision whether to issue an injunction is committed to the court's discretion. *Blalock Eddy Ranch v. MCI Telecommunications Corp.*, 982 F.2d 371, 375 (9th Cir.1992).

Federal court injunctions staying or barring state court actions have been approved under the second and third exceptions set forth in the Anti–Injunction Act,[5] particularly in situations where, as here, a federal court has retained jurisdiction over a nationwide or global settlement. *See, e.g., Flanagan*, 143 F.3d at 545 ("Where the district court expressly retains jurisdiction to enforce a settlement agreement, and to resolve disputes that may arise under it, litigation in state court 'would pose a significant risk of frustrating the district court's jurisdiction over the consent judgment' " (citation omitted)).

The first relevant Anti–Injunction Act exception, injunctions "necessary in aid of [federal court] jurisdiction," 28 U.S.C. § 2283, allows federal courts to enjoin state courts in cases where "some federal injunctive relief may be necessary to prevent a state court from so interfering with a federal court's consideration or disposition of a case as to seriously impair the

---

**5.** The first exception to the Anti–Injunction Act, injunctions "expressly authorized by Act of Congress," has no application to this case.

federal court's flexibility and authority to decide that case," *Atlantic Coast*, 398 U.S. at 295, 90 S.Ct. 1739, or where the state court proceeding threatens to " 'render the exercise of the federal court's jurisdiction nugatory.' " *Bennett*, 285 F.3d at 806 (citation omitted).

In *Flanagan*, *supra*, the district court enjoined a state court action for breach of a settlement agreement that the court had approved. The Ninth Circuit affirmed the injunction under both the second and third exceptions, finding that the state court action was an "entirely unjustified attempt" to evade the agreement, "incorporated in a court order and judgment, to submit disputes and enforcement proceedings regarding their settlement to the federal district court." *Flanagan*, 143 F.3d at 546; *see also Hanlon*, 150 F.3d at 1025 (temporary approval of nationwide settlement stayed the state class actions; federal court had power to issue an injunction against continued state proceedings to ensure control over the integrity of the settlement approval process).

In *In re Agent Orange Product Liability Litigation*, 996 F.2d 1425 (2nd Cir. 1993), the Second Circuit approved the district court's removal of an otherwise unremovable state court action[6] "in order to effectuate and prevent the frustration of orders it has previously issued in its exercise of jurisdiction otherwise obtained." 996 F.2d at 1431 (internal quotations and citation omitted). The court explained:

> If Agent Orange victims were allowed to maintain separate actions in state court, the deleterious effect on the *Agent Orange I* settlement mechanism

would be substantial. The parties to the settlement implicitly recognized this when they agreed that all future suits by class members would be permanently barred. It is difficult to conceive of any state court properly addressing a victim's tort claim without first deciding the scope of the *Agent Orange I* class action and settlement. The court best situated to make this determination is the court that approved the settlement and entered the judgment. * * * In so holding, we are not unmindful of the fact that the All Writs Act is not a jurisdictional blank check which district courts may use whenever they deem it advisable. * * * Given the "exceptional circumstances" surrounding the instant case, issuance was a proper exercise of judicial discretion. The district court was not determining simply the preclusive effect of a prior final judgment on claims or issues expected to be raised in subsequent collateral proceedings; *it was enforcing an explicit, ongoing order against relitigation of matters it already had decided, and guarding the integrity of its rulings in complex multidistrict litigation over which it had retained jurisdiction.*

*In re Agent Orange*, 996 F.2d at 1431 (emphasis added; citations omitted); *see also In re Diet Drugs*, 282 F.3d at 235–37 and 235 n. 12 ("It is in the nature of complex litigation that the parties often seek complicated, comprehensive settlements to resolve as many claims as possible in one proceeding. These cases are especially vulnerable to parallel state actions * * * ").[7]

---

**6.** In *Syngenta Crop Protection, Inc. v. Henson*, 537 U.S. ——, 123 S.Ct. 366, 370, 154 L.Ed.2d 368 n. * (2002), the Court held that the All Writs Act does not furnish removal jurisdiction, but confirmed that a proper procedure is to "apply to the court that approved a settlement for an injunction requiring dismissal of a rival action."

**7.** Although parallel in personam state court proceedings do not necessarily present "the sort of impediment envisioned by *Atlantic*

The second relevant Anti–Injunction Act exception, injunctions "necessary * * * to protect or effectuate [federal court] judgments," 28 U.S.C. § 2283, is known as the "relitigation" exception. The relitigation exception, which applies when the state court has yet to decide the res judicata effect of the federal court judgment, was designed to permit a federal court to "prevent state litigation of an issue that previously was presented to and decided by the federal court." *Chick Kam Choo v. Exxon Corp.*, 486 U.S. 140, 147, 108 S.Ct. 1684, 100 L.Ed.2d 127 (1988); *Flanagan*, 143 F.3d at 546. The exception is "founded in the well-recognized concepts of *res judicata* and collateral estoppel" and is particularly applicable where, as here, "the district court has expressly retained jurisdiction to construe and enforce a settlement agreement." *Flanagan*, 143 F.3d at 546 (citations omitted).

█ I have carefully considered this matter, and in the exercise of my discretion conclude that the requested injunction is proper and should issue. As I stated on the record during the hearing, the Minnesota state court was wrong to submit Lester's damages claim for repair costs covered by the class action settlement to the jury for consideration. By doing so, the court permitted the jury to circumvent the settlement agreement and the elaborate negotiated claims resolution procedures contained therein, and create, as LP suggests, a "subclass" of class members whose claims would, if the jury verdict is permit-

ted to stand, enjoy special treatment not available to other class members. Moreover, there is a substantial risk that others in Lester's position, encouraged by the jury verdict, will pursue similar claims, thus further impairing the class action settlement and interfering in this court's stewardship over it.

I find that the Minnesota state court's actions seriously impair the integrity of this court's Order, and directly interfere with and seriously impair my ability to supervise, implement, enforce, construe and interpret the class action settlement agreement over which I have retained exclusive jurisdiction. Moreover, by permitting Lester to pursue to verdict claims for damages plainly covered by the class action settlement, the Minnesota court allowed relitigation of issues already presented to and decided by this court many years ago. I conclude, therefore, that the injunction LP requests is proper under the Anti–Injunction Act and is necessary both in aid of this court's continued jurisdiction and to protect and effectuate this court's Order, Final Judgment and Decree.

### 5. Full Faith and Credit and the Rooker–Feldman Doctrine

█ Lester contends that two limitations on federal court power to intervene in state court proceedings preclude the requested injunction. The first limitation is the Full Faith and Credit Act, 28 U.S.C. § 1738, which " 'directs all courts to treat a state court judgment with the same respect that it would receive in the courts of

---

*Coast," Bennett v. Medtronic, Inc.*, 285 F.3d 801, 806 (9th Cir.2002), in *In re Diet Drugs*, the Third Circuit noted that courts often analogize complex litigation cases to actions in rem. The "in rem analogy may help to bring into focus what makes these [complex] cases stand apart. In cases in rem, 'the jurisdiction over the same res necessarily impairs, and may defeat, the jurisdiction of the federal

court already attached.' * * * Similarly, where complex cases are sufficiently developed, mere exercise of parallel jurisdiction by the state court may present enough of a threat to the jurisdiction of the federal court to justify issuance of an injunction." *In re Diet Drugs*, 282 F.3d 220, 235 n. 12 (3rd Cir.2002) (citations omitted).

the rendering State.'" *In re Diet Drugs*, 282 F.3d at 240 (citation omitted). The Full Faith and Credit Act and the relitigation exception to the Anti–Injunction Act, as construed by the courts, are, however, not incompatible. In *Parsons Steel, Inc. v. First Alabama Bank*, 474 U.S. 518, 106 S.Ct. 768, 88 L.Ed.2d 877 (1986), the Supreme Court clarified that the relitigation exception is limited to those situations in which the state court has not yet finally ruled on the merits of the res judicata issue: "Once the state court has finally rejected a claim of res judicata, then the Full Faith and Credit Act become applicable and federal courts must turn to state law to determine the preclusive effect of the state court's decision." 474 U.S. at 524, 106 S.Ct. 768.

▆ The second limitation, the *Rooker–Feldman*[8] doctrine, generally prohibits review of state court decisions by federal courts other than the United States Supreme Court. *In re Diet Drugs*, 282 F.3d at 240. The doctrine prevents review of *final*[9] state court decisions. *Id.* at 241. Like the Full Faith and Credit Act prohibitions, applicability of the *Rooker–Feldman* doctrine depends on the existence of a final state court decision, which does not yet exist in the Minnesota litigation. Moreover, I agree with the Third Circuit's view, expressed in *In re Diet Drugs*, that "where, as here, a federal court's proper exercise of its jurisdiction to manage its cases has the secondary effect of voiding a state court determination, it is not a review of that order for purposes of the

*Rooker–Feldman* doctrine." 282 F.3d at 242.

With respect to both the *Rooker–Feldman* doctrine and the Full Faith and Credit Act, Lester takes the position that in denying LP's motion for partial summary judgment and motion for directed verdict, the Minnesota court has already ruled on the res judicata effect of the settlement agreement. A close reading of the court's rulings and the jury instructions, however, does not support Lester's position. The court denied the motions based on fact questions, and allowed the cost to repair claims to go to the jury on instructions that attempted to distinguish between siding installed before and after January 1, 1996. The state court's rulings are the subject of pending motions, and I agree with LP that because the Minnesota state court has not yet entered judgment on the jury verdict, its decision is not final. Consequently, I conclude that neither the *Rooker–Feldman* doctrine nor the Full Faith and Credit Act prohibit issuance of the requested injunction in this case.[10]

### 6. Scope of Injunction

▆ Having concluded that an injunction should issue, I turn to the question of the proper scope. LP proposes that the court enjoin entry of judgment on $14.6 million of the $29.6 million jury verdict. The figure LP proposes includes $11.2 million in repair/replacement costs for siding covered by the class action settlement, plus $3.4 million representing the cost to Lester of the siding.

**8.** *See Court of Appeals v. Feldman*, 460 U.S. 462, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983); and *Rooker v. Fidelity Trust Co.*, 263 U.S. 413, 44 S.Ct. 149, 68 L.Ed. 362 (1923).

**9.** *Doe & Associates Law Offices v. Napolitano*, 252 F.3d 1026 (9th Cir.2001), on which Lester relies, is inapposite. In *Doe*, the plaintiffs initiated the federal action for the purpose of

enjoining ongoing state proceedings, a far different scenario than that presented here.

**10.** Lester's two other arguments, that the requested injunction would violate its due process rights and that equity favors Lester, are without merit and will not be separately discussed.

I agree with LP that the scope of the injunction should include the damages award of $11.2 million for repair and replacement of siding Lester purchased and installed before January 1, 1996. I do not agree, however, that the $3.4 million in damages the jury awarded Lester for the cost of the siding is similarly improper. That portion of the damages award represents the difference between what Lester paid for the siding ($3.4 million) and its actual value, which the jury must have determined to be $0. LP has failed to present any persuasive argument as to why Lester's claimed damages for purchase of defective siding are precluded by the class action settlement.

In summary, I conclude that the injunction must be restricted to the $11.2 million in damages awarded to Lester for repair and replacement of siding subject to the class action settlement.

### PERMANENT INJUNCTION

Based upon the Findings and Conclusions set forth above, it is hereby

ORDERED AND ADJUDGED that LP's Motion (# 558) to Enforce Class Action Settlement (Minnesota) is GRANTED as follows. In the matter entitled *Lester Building Systems and Lester's of Minnesota, Inc. v. Louisiana–Pacific Corporation and Canton Lumber Company,* McLeod County District Court Case No. 43–C6–00–000335, I hereby permanently enjoin the Minnesota state court from entering judgment on that portion of the jury verdict rendered on October 15, 2002, that awards damages to plaintiffs for costs to repair and replace siding that is subject to this court's Order, Final Judgment and Decree in the nationwide class action settlement. Specifically, I enjoin the Minnesota state court from entering judgment against LP and in favor of Lester Building Systems and Lester's of Minnesota, Inc.,

in the sum of $11.2 million of the total of $13.2 million in damages the jury awarded under the category "Cost to Repair Buildings" in the jury verdict form.

IT IS SO ORDERED.