LESTER BUILDING SYSTEMS, a
division of Butler Manufacturing
Company, et al., Appellants,

v.

LOUISIANA–PACIFIC
CORPORATION,
Respondent.

No. A07–155.

Supreme Court of Minnesota.

March 5, 2009.

James L. Volling, Faegre & Benson LLP, Minneapolis, MN, Kell M. Damsgaard, Brian W. Shaffer, Morgan, Lewis & Bockius LLP, Philadelphia, PA, for appellants.

James K. Langdon, Michelle S. Grant, Eric R. Sherman, Dorsey & Whitney LLP, Minneapolis, MN, for respondent.

## OPINION

PAGE, Justice.

Appellants Lester Building Systems and Lester's of Minnesota (collectively, Lester) sued Louisiana–Pacific Corporation (LP) for breach of contract, breach of implied and express warranties, and fraud. A McLeod County jury found in favor of Lester and awarded $29.6 million in damages. The award included $13.2 million for the cost to repair buildings owned by Lester's customers. LP appealed, claiming that a federal class-action settlement precluded Lester from recovering $11.2 million of the $13.2 million awarded as repair-cost damages. The court of appeals reversed the jury award with respect to the disputed amount, holding that, "under Minnesota law, a reseller cannot recover repair-cost damages when it has already been released from liability." *Lester Bldg. Sys. v. La.-Pac. Corp. (Lester II )*, No. A07–155, 2008 WL 467426, at *4 (Minn. App. Feb. 5, 2008). In this appeal, Lester argues that: (1) the court of appeals erred

in holding that Minnesota law precludes a reseller from recovering the cost of making repairs if the reseller has no legal obligation to make those repairs; and (2) the court of appeals erred in holding that the federal class-action settlement eliminated Lester's liability to its customers. We affirm.

Lester designs and sells non-residential wood building systems, including livestock barns.[1] Lester sells its buildings directly to farmers and indirectly through a network of independent dealer-builders. LP manufactures building materials and wood products for home and commercial builders across the country.

In the 1980s, LP developed an external siding product known as Inner–Seal®. In 1991, Lester switched from using plywood in its building systems to using Inner–Seal®. Around that same time, LP began receiving complaints from around the country that moisture was causing the Inner–Seal® siding to swell and deteriorate. LP assured Lester that these complaints involved isolated incidents. Over the next five years, Lester purchased approximately $3.4 million of Inner–Seal® and used it to construct more than 2,600 hog barns.

Lester received its first defective Inner–Seal® claims from its customers in 1995 and, within a year, switched back to using plywood. Initially, LP funded Lester's repairs of the defective siding on Lester's customers' barns. In September 1998, however, LP informed Lester that it would no longer fund repairs because a national class-action settlement agreement had resolved all potential Inner–Seal® claims. Without LP's cooperation and funding, Lester stopped repairing its customers' barns and informed its customers that further recovery would be available only under the terms of the class-action settlement.

The settlement agreement, filed on October 18, 1995, was the result of a lawsuit commenced in federal district court in Oregon. The settlement covered all claims "arising from or in any way relating to any defects or alleged defects of Exterior Inner–Seal™ Siding" installed before January 1, 1996. Only claims for bodily injury, for damages to other structural components, or arbitrator-approved claims based on a builder's improper installation were exempt from the settlement. Class members had the right to opt out of the class before May 27, 1996. For claims made after January 1, 2003, recovery was limited to the terms of LP's 25–year limited warranty. In addition to settling the class members' claims, the agreement also released "persons or entities [such as Lester] in the chain of distribution, installation or finishing of the Exterior Inner–Seal siding ... from claims based solely on distribution, handling, installation, specification, or use of the Exterior Inner–Seal™ Siding." Under an amendment to the agreement, LP assumed full liability for all covered claims for damaged siding, whether or not LP was the named defendant.

The settlement agreement did not require LP to fund all potential claims up front. Instead, the agreement provided for graduated annual payments by LP to fund and pay the claims. Beginning with the fourth year of the agreement, if the amount of approved claims exceeded the money in the fund, LP could elect on an annual basis to either terminate the agreement or make further graduated payments to the fund. If LP chose to terminate the agreement, the amendment to the agree-

---

**1.** In *Sandpiper Village Condominium Ass'n v. Louisiana–Pacific Corp.*, 428 F.3d 831 (9th Cir.2005), the Ninth Circuit details, at length, the facts underlying this case. We state here only those facts germane to the issue before us.

ment indicates that the class members were free to renew their individual claims against LP, but not against third parties in the chain of distribution such as Lester.

At some point, the number of claims far outpaced LP's annual contributions, and many class members were forced to wait years to find out if LP would elect to fund their claims. In 1998, claimants were given the choice between receiving immediately a reduced payment for their claims or waiting indefinitely in the hope of receiving the full amount of their claim. Lester's customers were unhappy with these choices. Lester calculated that the total cost to repair its customers' barns was $13.2 million. Many of Lester's customers, however, chose to take the reduced payment, and they received, as a whole, $640,000. As a result, Lester claimed that its reputation, sales, and profits suffered tremendously.

In May 2000, Lester sued LP in McLeod County District Court for breach of contract, breach of warranties, and fraud. With respect to damages, Lester argued, among other things, that our decision in *Louis DeGidio Oil & Gas Burner Sales & Service, Inc. v. Ace Engineering Co.*, 302 Minn. 19, 225 N.W.2d 217 (1974), allowed Lester to recover from LP its costs related to repairing defective hog barns that it sold to its customers, regardless of Lester's legal liability to its customers. During trial, LP moved for a directed verdict, asserting that the terms of the class-action settlement barred any claim for repair-cost damages. Although the district court disagreed with Lester's interpretation of *DeGidio*, it nonetheless denied LP's motion and submitted the question of repair-cost damages to the jury for an advisory opinion, acknowledging at the time that the decision to do so "may be [LP's] strongest appeal." Specifically, the court instructed the jury that the "element of Lester's

damages claim for the cost to repair the buildings with Inner–Seal is barred as to any particular building" unless one of three exceptions applied: (1) the building was constructed after January 1, 1996; (2) the building's siding failure occurred after January 1, 2003; or (3) the claim for the building was unpaid, timely submitted, and LP failed to continue funding.

In its damage award to Lester, the jury awarded $3.4 million for Lester's purchase price of Inner–Seal®, $10.2 million for lost profits up through 2002, $2.8 million for the cost of restoring goodwill, and $13.2 million for the cost of repairing Lester's customers' barns. With respect to the repair costs, the jury was asked two questions: (1) how much should Lester receive for repair costs on buildings not covered by the class action; and (2) how much should Lester receive for repair costs on all buildings, regardless of the class action. The jury answered $13.2 million for both questions.

Based on testimony at trial, LP conceded that $2 million of the $13.2 million awarded for repair costs was for buildings built after January 1, 1996, and was not covered by the class action. However, LP argued that the remaining $11.2 million was for claims covered by the settlement in the class action. LP sought and obtained an injunction in the Oregon federal court enjoining the McLeod County District Court from entering judgment against LP for the $11.2 million. *In re La.-Pac. Inner–Seal Siding Litig.*, 234 F.Supp.2d 1170, 1178, 1182 (D.Or.2002) (finding those damages were "expressly encompassed in and precluded by the nationwide class action settlement"). On that basis, the $11.2 million was excluded from the state court judgment. *Id.* at 1182.

While the Oregon federal court's injunction was on appeal, LP moved the McLeod

County District Court for a judgment notwithstanding the verdict (JNOV) and for a new trial, claiming that the jury instructions relating to repair costs were incorrect as a matter of law. The district court denied LP's motions, and the Minnesota Court of Appeals affirmed that denial. *Lester Bldg. Sys. v. La.-Pac. Corp.* (*Lester I*), No. A03–48, 2004 WL 291998 (Minn. App. Feb. 17, 2004), *rev. denied* (Apr. 28, 2004). In doing so, the court declined to address the issue of repair-cost damages because, at the time of its decision, the federal appeal was pending. *Id.* at *8.

In October 2005, the Ninth Circuit vacated the Oregon federal court's injunction as violative of the Anti–Injunction Act, 28 U.S.C. § 2283 (2000). *Sandpiper Vill. Condo. Ass'n v. La.-Pac. Corp.*, 428 F.3d 831, 850–53 (9th Cir.2005). In response, the McLeod County District Court amended its judgment to include the $11.2 million. LP appealed the amended judgment claiming: (1) that Minnesota law prohibited Lester from recovering costs to repair barns covered by the settlement agreement; (2) that the federal law of claim preclusion prohibited Lester from recovering the costs to repair the barns; and (3) that the district court abused its discretion when it denied LP's motion for a new trial. The court of appeals held that the district court erred when it allowed the issue of repair-cost damages to go to the jury. *Lester II*, 2008 WL 467426, at *6. The court of appeals also concluded that *DeGidio* requires a reseller such as Lester to be liable to its customers before the reseller can recover repair-cost damages and that Lester had no such liability because the class-action settlement agreement released Lester from any liability. *Id.* at *5. As a result, the court of appeals reversed the jury's verdict of $11.2 million in repair-cost damages, thereby reversing the district court's denial of LP's motions for a directed verdict and for a JNOV.[2] *Id.* at *6. We granted Lester's petition for review.

■■■■ We review a district court's denial of a directed verdict de novo. *See, e.g., Nemanic v. Gopher Heating & Sheet Metal, Inc.*, 337 N.W.2d 667, 669 (Minn.1983) ("In reviewing a directed verdict, we make an independent determination of the sufficiency of the evidence to present a fact question to the jury."). A directed verdict should only be granted if: (1) it would be the duty of the district court to set aside a contrary verdict as being manifestly against the entire evidence when viewed in the light most favorable to the nonmoving party; or (2) the verdict would be contrary to the applicable law. *See id.* at 669–70. Our review of the denial of a motion for JNOV is also de novo. *Diesen v. Hessburg*, 455 N.W.2d 446, 449 (Minn.1990). When a district court has denied a motion for JNOV, on appellate review, we must "affirm if there is any competent evidence reasonably tending to sustain the verdict." *Rettman v. City of Litchfield*, 354 N.W.2d 426, 429 (Minn.1984). When examining verdicts on appeal, we consider the evidence in the light most favorable to the prevailing party, and we will not set the verdict aside if it can be sustained on any reasonable theory of the evidence. *See Carpenter v. Mattison*, 300 Minn. 273, 276, 219 N.W.2d 625, 628–29 (1974).

Although both parties rely heavily on *DeGidio*, as did the court of appeals, we do not find the case particularly helpful in resolving the question of repair-cost damages. The jury in *DeGidio* awarded breach of warranty and consequential damages to a heating contractor, including reimbursement of money spent to replace

**2.** The 2006 amendments to the Rules of Civil Procedure consolidated the motions for a directed verdict and for a JNOV under Rule 50's new Judgment as a Matter of Law.

one defective burner. 302 Minn. at 29, 225 N.W.2d at 224. But the jury did not grant any damage award specifically for the contractor to make further repairs. *Id.* The issues presented in *DeGidio* involved the value of defective goods and duplications in the jury award but not repair-cost damages. *Id.* Any discussion of a reseller's liability with regard to repair costs in *DeGidio* is mere dicta. *Id.* For this reason, *DeGidio* does not guide our decision in this case.

■ Lester claims that it should recover repair costs as a type of consequential damages. Under Minnesota's version of the Uniform Commercial Code, a buyer may recover consequential damages if a seller breaches its warranties or commits fraud. *See* Minn.Stat. §§ 336.2–714(3), –715, –721 (2008). Consequential damages include "any loss resulting from general or particular · requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise." Minn.Stat. § 336.2–715(2)(a) (2008). Generally, buyers who actually incur out-of-pocket expenses in repairing defective goods may recover repair-cost damages, either as the value of the buyer's direct damages for a breach of warranty or as consequential damages. *See, e.g., IMI Norgren Inc. v. D & D Tooling & Mfg., Inc.,* 247 F.Supp.2d 966, 970–73 (N.D.Ill. 2002). In cases involving a reseller of goods, the reseller may also recover damages for future repair costs if the reseller is contractually liable to a third-party for making those repairs. *See Coastal Modular Corp. v. Laminators, Inc.,* 635 F.2d 1102, 1105 (4th Cir.1980). The burden of pleading and proving consequential damages is on the buyer. *Bemidji Sales Barn, Inc. v. Chatfield,* 312 Minn. 11, 15, 250 N.W.2d 185, 188 (1977). Awards of consequential damages must be proven with a reasonable certainty. *Leoni v. Bemis Co.,* 255 N.W.2d 824, 826 (Minn.1977).

■ Lester claims that it should recover repair costs as consequential damages for two reasons. First, Lester argues that it remains liable to its customers for repairing or replacing defective Inner–Seal® siding because the class-action settlement agreement did not eliminate Lester's liability to repair or replace its customers' barns. This argument requires us to interpret the settlement agreement, which we do de novo. *See State ex rel. Humphrey v. Philip Morris USA, Inc.,* 713 N.W.2d 350, 355 (Minn.2006).

■ The settlement agreement provides:

> To the extent claims may be asserted against persons or entities in the chain of distribution, installation or finishing of the Exterior Inner–Seal siding, the Releasing Party shall be deemed to and does hereby release and forever discharge those persons or entities from claims based solely on distribution, handling, installation, specification, or use of the Exterior Inner–Seal™ Siding.

We read this clear and unambiguous language to release Lester, an entity in the chain of distribution, from all defective Inner–Seal® claims covered by the settlement agreement. Specifically, the record presented here indicates that the settlement agreement released Lester from all claims based on defective Inner–Seal® by Lester's customers whose siding was installed before January 1, 1996. As noted earlier, LP concedes that, of the $13.2 million awarded for repair-cost damages, Lester was entitled to recover $2 million for barns built after January 1, 1996, because they are not covered by the settlement agreement. In addition, the record before us does not indicate that any of Lester's customers opted out of the agreement. Therefore, we conclude that Lester is not obligated to make any repairs to the

barns covered by the settlement agreement. As a result, Lester is not entitled to recover any of the disputed $11.2 million awarded by the jury for consequential damages related to repair costs.

 Second, Lester claims that aside from its legal liability argument, it should also recover repair-cost damages because it has a business and practical obligation to make the repairs. Whether or not business and practical obligations are an acceptable reason for incurring repair-cost damages, there is nothing in this record to show that Lester has such an obligation. As a result, Lester has not proven with a reasonable certainty that its obligation to make repairs was "the normal procedure" or "the accepted practice in this business." *Woodbury Chemical Co. v. Holgerson*, 439 F.2d 1052, 1055 (10th Cir.1971).

Further, to the extent that Lester's claim is the actual value of its lost profits or loss of goodwill, Lester has already recovered $10.2 million for lost profits and $2.8 million for the cost to restore goodwill through the date of trial. To the extent that Lester's claims are for loss of reputation damages, our review of the record satisfies us that no such claim was raised or proven at trial.

Because Lester did not meet its burden to plead and prove its claim for repair-cost damages and because the class-action settlement eliminated any liability Lester may have had for the repair or replacement of barns covered by the settlement, we affirm the decision of the court of appeals to reverse the jury's verdict.[3]

Affirmed.

---

**3.** Having decided that Lester may not recover repair-cost damages, we need not address any other issues raised in this appeal.