CLIFTON, Circuit Judge:
Lester Building Systems and its affiliate, Lester’s of Minnesota, Inc. (collectively “Lester”), appeal an order permanently enjoining entry of judgment on a portion of a jury verdict rendered in favor of Lester and against Louisiana-Pacific Corporation (“L-P”) in Minnesota state court. In re Louisiana-Pacific Inner-Seal Siding Litigation, 234 F.Supp.2d 1170 (D.Or.2002). The district court exercised its authority under the All Writs Act, 28 U.S.C. § 1651, to partially enjoin entry of the judgment on the ground that the state court award was inconsistent with the settlement reached in a prior nationwide class action involving L-P and over which the court retained jurisdiction. We conclude that the injunction violates the Anti-Injunction Act, 28 U.S.C. § 2283, and reverse.
I. Background

Class Action and Settlement

L-P manufactures building materials from industrial wood products and pulp and markets itself as an innovator in the development of new, affordable and environmentally advanced products for home and commercial builders. Beginning in 1985, L-P manufactured and sold an exterior composite-wood siding designed to resemble conventional lumber for use on residential and other structures. L-P referred to this siding as “Inner-Seal Siding,” a registered trademark. L-P provided a 25-year limited warranty with the purchase of Inner-Seal Siding.
In 1995, owners of structures on which Inner-Seal Siding had been installed brought a class action lawsuit in the District Court for the District of Oregon for damages resulting from the failure of Inner-Seal Siding. The class plaintiffs alleged that while L-P had advertised and marketed Inner-Seal Siding as durable, effective and superior to other types of exterior siding, the siding had prematurely rotted, buckled, cracked and otherwise deteriorated when exposed to normal weather conditions.
The federal action, which covered a nationwide class of claimants, settled shortly after it was filed. On April 26, 1996, the district court approved and adopted a settlement agreement and entered an order and final judgment. Pursuant to the settlement agreement and order, L-P agreed to finance a settlement fund and, in exchange, class claims related to the failure of Inner-Seal Siding were released.[1] L-P *835 also agreed to reinstate the balance of the term on its 25-year warranty upon termination of the settlement agreement, to be measured from the date of original installation. The settlement was binding on all class members, save those who timely requested exclusion from the class.[2] The settlement did not cover claims arising from the failure of new siding installed after January 1, 1996.
In addition to the release of claims against L-P, the class members released all claims related to the failure of Inner-Seal Siding (installed prior to January 1, 1996) against persons or entities “involved in the distribution, installation, construction and first time sale of structures with Exterior Inner-Seal Siding.” This provision was included to foreclose the possibility that class members would bring claims against businesses located in the Inner-Seal Siding chain of distribution. Claims against L-P by persons or entities within the chain of distribution were not released, however.
Under the settlement agreement and order, the district court retained jurisdiction, described as follows:
[Ejxclusive and continuing jurisdiction over the Actions and Parties, including all members of the Class, the administration and enforcement of the settlement, and the benefits to the Class, including for such purposes as supervising and implementation, enforcement, construction, and interpretation of the Settlement Agreement.
By September 2003, L-P had agreed to meet all funding obligations and had made cash payments totaling approximately $509 million to about 142,000 claimants in satisfaction of approximately $823 million in claims.[3]

*836
Minnesota Lawsuit

Lester, a Minnesota corporation, designs, constructs and sells pre-engineered wood buildings for livestock confinement. Lester purchased Inner-Seal Siding from 1991 to 1996 and incorporated the siding into the structural wall panels of buildings sold to its customers. As a distributor of buildings equipped with Inner-Seal Siding, Lester was not a class member and was not a party to the settlement agreement. Class member claims against Lester were released by the settlement, however.
In March 2000, Lester brought an action against L-P in Minnesota state court. Lester sought damages for breach of contract, breach of express and implied warranties, fraud and loss of business reputation as a consequence of having used defective Inner-Seal Siding in its buildings. Lester alleged that it had sold approximately 2,600 buildings with Inner-Seal Siding but that it stopped using the siding in 1996 because of complaints from its dealers and customers. Lester further alleged that it “has received and will continue to receive hundreds of claims and complaints ... which must be administered and resolved in order to avoid further losses.”
Lester recognized that new claims by class members were foreclosed by the settlement agreement but observed.that the settlement “provide[d] no relief or monetary compensation to [Lester], [its] dealers, or others similarly situated.” Because its injuries were not redressed by the settlement agreement, Lester asserted that L-P was
obligated and required: (i) to pay, reimburse, and indemnify [Lester] for all monies [it] pay[s] and expenses [it] reasonably incur[s] in properly satisfying the claims of [its] dealers and customers arising from defects in and failure of LP’s Inner-Seal; and (ii) to pay, reimburse, and indemnify [Lester] for all other damages and losses [it has] now incurred and will incur as a result of [its] purchase and use of L-P’s Inner-Seal [Siding].
Lester sought damages “in an amount to be determined at trial” and “an affirmative injunction requiring L-P to resume honoring its warranties and other legal obligations, including, but not limited to reimbursing [Lester] for satisfying the claims of [Lester’s] dealers and customers.”
L-P disagreed with Lester’s interpretation of the res judicata effect of the settlement agreement and moved for partial summary judgment on all present and future claims against L-P related to the failure of Inner-Seal Siding. In particular, L-P argued that Lester’s claim for the costs to repair its customers’ buildings was barred because a substantial portion of Lester’s customers were members of the prior class action and covered by the settlement agreement.
The trial court denied the motion. The court held that under Minnesota law a distributor can recover costs it may incur in the future with respect to a defective product that was placed in the stream of commerce. The court concluded that there were genuine issues of material fact as to whether the settlement agreement precluded recovery of those damages and with respect to the amount of those damages, if any.
The case was tried in September and *837 October 2002[4] A significant portion of the trial centered on the issue of damages. Lester argued that moral and business compulsions required it to remove and replace , the Inner-Seal Siding on every building that it sold, even if the owner of the building had received at least some compensation in the prior settlement with L-P. Lester’s position was explained by its president, who testified that
the best thing we could expect to come out of this is that we finally get ... the farmer what he’s entitled to, which is he bought a building and expected to have his siding hold up, and that’s what we need to make happen and that’s why we’re here. We’re trying to make that result happen.
I want each of you to know that we’re going to fix these buildings. That’s why we’re here. Counsel in some of the lead up to trial has at least left me with some kind of general impression, that, you know, is there any guarantee that the customer will be taken care of here? And I would ask you to look at all the different people from Lester and its dealers that you’ve got a chance to meet over the last two weeks and know that we’re here because we want to fix these buildings and that’s what we’re going to do.
Lester offered evidence that repairing the siding on every affected building would cost $13.2 million. Of that total, approximately $2 million was for buildings that were fabricated after January 1, 1996, and thus not covered by the settlement. The evidence further showed that the total cost of the siding purchased by Lester and used in its buildings was $3.4 million, with approximately $240,000 of that amount falling outside of the terms of the settlement.
At the conclusion of Lester’s case, L-P moved for directed verdict. L-P again argued that a portion of Lester’s claims were barred by the class action settlement agreement. The trial court denied the motion. The court reasoned that the motion was premature because L-P planned to submit expert testimony concerning the mechanics of the class action and settlement. The court concluded that a final resolution of the effect of the settlement agreement could be made after further factual development.
As the trial court anticipated, the defense focused on the effect of the class action settlement. For instance, L-P called the special master appointed by the district court to oversee the settlement. The special master explained the settlement process, the terms of the settlement and the district court’s order and final judgment and decree. L-P also called an expert witness who testified that, based on a comparison of the list of opt-outs and a list of purchasers of Lester’s buildings, none of Lester’s customers had opted out of the class action settlement. The expert further asserted that as of October 11, 2002, $640,000 had been paid to Lester’s customers from the settlement fund.[5]
The trial court, apparently accepting LP’s argument that the class action settlement precluded damages for repair costs *838 involving buildings that were covered by the settlement agreement, instructed the jury that repair costs were not recoverable unless they fell outside the scope of the settlement:
You have heard evidence of the settlement of a nationwide class action against Louisiana-Pacific. Lester is not a party to that action and therefore the claims that it makes in this case are not barred by the class action settlement. The Court has determined, however, that one element of Lester’s damages, its claims for the cost to repair the buildings with Inner-Seal, is barred as to any particular building, unless one of the following exceptions applies:
(a) the building was constructed on or after January 1,1996;
(b) the building has or may have a siding performance failure after January 1, 2003; or
(c) the building is one for which claims are submitted prior to January 1, 2003, have not been paid and the class action is not funded in August 2003.[6]
Consistent with the court’s instruction, the special verdict form directed the jury to specify the damages, if any, awarded for repair costs and the damages it would have awarded if the settlement agreement had not barred certain claims.
Following deliberations, the jury returned a verdict of $29.6 million in favor of Lester.[7] The jury determined that an award of $13.2 million was necessary to compensate Lester for the cost to repair buildings. The jury listed the same figure, $13.2 million, as the amount it would have awarded but for the class settlement. In other words, the jury determined as a factual matter that none of the repair costs were covered by the settlement. The jury also awarded Lester $3.4 million for the cost of Inner-Seal Siding, $10.2 million for lost profits and $2.8 million to restore goodwill.
On October 24, 2002, the trial judge signed and filed the Findings of Fact, Conclusions of Law, and Order for Judgment based on the jury verdict. In accordance with the Minnesota Rules of Civil Procedure, the judge stayed entry of judgment for 30 days.[8] By order dated November 18, 2002, the stay was extended at L-P’s request until post-trial motions were resolved.

*839
Federal Injunction

On November 6, 2002, just three weeks after the jury verdict in favor of Lester, L-P filed a motion to enforce the settlement agreement in the Oregon federal district court with continuing jurisdiction over the settlement. L-P asked the district court to enjoin the state court from entering judgment on the portion of the verdict that was inconsistent with the class action settlement, namely, the jury’s award of damages for the cost to repair buildings that had Inner-Seal Siding installed prior to January 1, 1996 and the award for the cost of the Inner-Seal Siding that Lester had purchased from L-P.
On December 13, 2002, the district court granted L-P’s motion in part and issued an “injunction enjoining the Minnesota state court from entering judgment on the portion of the jury’s damages award that is encompassed in and precluded by the class action settlement agreement.” In re Louisiana-Pacific, 234 F.Supp.2d at 1172. The court found that that portion of the award amounted to $11.2 million.[9] Id. at 1182.
Based on its review of Minnesota case-law, the court determined that the state court had erred when it held that Lester could recover the cost to repair defective Inner-Seal Siding on its customers’ buildings.[10] Id. at 1177, 1180. Because Minnesota state law did not recognize the repair costs claim, the court concluded that “the Minnesota jury verdict wrongly includes damages expressly encompassed in and precluded by the nationwide class action settlement.” Id. at 1177-78.
Having found that the verdict included damages covered by the settlement, the court reasoned that allowing the judgment to stand in full would not only “circumvent the settlement agreement” but also “seriously impair the integrity of this court’s Order[] and directly interfere with and seriously impair [the court’s] ability to supervise, implement, enforce, construe and interpret the class action settlement agreement over which [the court has] retained exclusive jurisdiction.” Id. at 1180. Because federal intervention in the state proceeding was “necessary both in aid of [its] continued jurisdiction and to protect and effectuate [its] Order, Final Judgment and Decree,” the court held that the injunction was proper under the All Writs Act and not barred by the Anti-Injunction Act. Id. at 1178, 1180. The court did not, however, enjoin entry of judgment on the $3.4 million in damages that represented the difference between what Lester had paid for Inner-Seal Siding and the actual value of the siding. Id. at 1182.
Lester timely appealed.

State Court Judgment

Before the injunction issued, L-P filed post-trial motions for judgment notwithstanding the verdict and for a new trial in state court. ■ Through the motions, L-P renewed its argument that a portion of the *840 verdict was barred by the class settlement. The motions were pending when the district court issued the injunction.
Following entry of the injunction, the state trial court took up and denied the motions. The court determined that the award was supported by the evidence presented at trial and should not be disturbed. Shortly thereafter, the court issued a revised Order for Judgment. To comply with the injunction, the court entered judgment awarding Lester $20,074,424.21.[11] The court held that if the injunction was vacated, reversed or lifted on appeal, it would reinstate the jury’s original award of $29.6 million, plus costs and interest.
L-P appealed. The Minnesota Court of Appeals affirmed. The court declined to address whether Lester’s claim for repair costs was properly submitted to the jury, however, because that presented an issue on appeal to this Court. Lester Bldg. Sys. v. Louisiana-Pacific Corp., 2004 WL 291998, No. A03-48, 2004 Minn.App. Lexis 156 (Feb. 17, 2004). The court explained that L-P could renew its challenge to the award of repair cost damages if the injunction was lifted. L-P’s petition for review by the Minnesota Supreme Court was denied. Lester Bldg. Sys. v. Louisiana Pacific Corp., No. A03-48, 2004 Minn. Lexis 248 (Apr. 28, 2004).
II. Standard of Review
We review the exercise of jurisdiction de novo. Gerritsen v. Consulado Gen. De Mexico, 989 F.2d 340, 344(9th Cir.1993). We review the decision to grant a permanent injunction for abuse of discretion. United States v. Yacoubian, 24 F.3d 1, 3 (9th Cir.1994). A legal error amounts to an abuse of discretion. Western Sys., Inc. v. Ulloa, 958 F.2d 864, 867 (9th Cir.1992). Accordingly, “[t]he question whether the district court had the power to issue the injunction is ... reviewed de novo, while its decision to exercise that power is reviewed for an abuse of discretion.” Id. Factual findings underlying an injunction are reviewed for clear error. Scott v. Pasadena Unified Sch. Dist., 306 F.3d 646, 653(9th Cir.2002).
III. Subject Matter Jurisdiction
We first address Lester’s jurisdictional argument.[12]
*841 Federal courts are courts of limited jurisdiction and possess “only that power authorized by the Constitution and statute.” Kokkonen v. Guardian Life Ins. Co. of America, 511 U.S. 375, 377, 114 S.Ct. 1673, 128 L.Ed.2d 391 (1994). Even where subject matter jurisdiction is satisfied in the original action, enforcement of a final settlement agreement and order “requires its own basis for jurisdiction” before the federal court may “interpret and apply its own judgment to the future conduct contemplated by the judgment.” Flanagan v. Arnaiz, 143 F.3d 540, 544-45(9th Cir.1998). The requisite independent basis for jurisdiction may be supplied by a provision in the settlement agreement and order that expressly retains jurisdiction in the district court for the purpose of overseeing and enforcing the prior judgment. Id. at 544. Such a provision, in conjunction with the All Writs Act, empowers a district court to protect its judgment from a subsequent action that frustrates the purpose of the settlement agreement and order. In re Baldwin-United, 770 F.2d at 335; see also Syngenta Crop Prot., Inc. v. Henson, 537 U.S. 28, 34 n. 1, 123 S.Ct. 366, 154 L.Ed.2d 368 (2002); Flanagan, 143 F.3d at 544.
In this case, the district court had subject matter jurisdiction over the underlying class action.[13] The settlement agreement and order in turn retained jurisdiction in the district court over the “Actions and Parties, including all members of the Class, the administration and enforcement of the settlement, and the benefits to the Class, including for such purposes as supervising and implementation, enforcement, construction, and interpretation of the Settlement Agreement.” This express retention of jurisdiction, coupled with the All Writs Act, gave the district court an adequate jurisdictional basis to entertain L-P’s motion to protect the settlement agreement through an injunction.[14] See In re Baldwin-United, 770 F.2d at 335; see also Syngenta, 537 U.S. at 34 n. 4, 123 S.Ct. 366; Flanagan, 143 F.3d at 544.
Lester concedes that the district court retained jurisdiction to protect and enforce the settlement agreement but argues that the court did not have jurisdiction over its state law claims. Lester misconstrues the substantive issue before the district court. L-P did not ask the district court to resolve Lester’s state law claims. The sole question before the court on L-P’s motion for injunctive relief was whether the state court action interfered with or threatened the prior settlement agreement. The district court was thus called upon to interpret the settlement agreement and to determine whether federal law allowed it to enjoin the state proceedings. By retaining jurisdiction over the enforcement of the settlement agreement, the court preserved the authority to make such a determination and thereby protect its prior judg *842 ment from a subsequent action that threatened the same.
IV. Anti-Injunction Act
We turn to the propriety of the injunction.[15] The district court drew the authority to issue the injunction from the All Writs Act, which allows federal courts to “issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law.” 28 U.S.C. § 1651. The All Writs Act is limited by the Anti-Injunction Act, which prevents a federal court from enjoining the “proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments.” 28 U.S.C. § 2283. The limitations expressed in the Anti-Injunction Act “rest[] on the fundamental constitutional independence of the States and their courts,” Atlantic Coast Line R.R. Co. v. Bhd. of Locomotive Eng’rs, 398 U.S. 281, 287, 90 S.Ct. 1739, 26 L.Ed.2d 234 (1970), and reflect “Congress’ considered judgment as to how to balance the tensions inherent in such a system,” Chick Kam Choo v. Exxon Corp., 486 U.S. 140, 146, 108 S.Ct. 1684, 100 L.Ed.2d 127 (1988). Rooted firmly in constitutional principles, the Act is designed to prevent friction between federal and state courts by barring federal intervention in all but the narrowest of circumstances. See Alton Box Bd. Co. v. Esprit de Corp., 682 F.2d 1267, 1271(9th Cir.1982); Bennett v. Medtronic, 285 F.3d 801, 805 (9th Cir.2002). Accordingly, the limited exceptions to the Anti-Injunction Act will not “be enlarged by loose statutory construction.” Atlantic Coast Line, 398 U.S. at 287, 90 S.Ct. 1739. Rather, “[a]ny doubts as to the propriety of a federal injunction against state court proceedings [will] be resolved in favor of permitting the state courts to proceed,” id. at 297, 90 S.Ct. 1739, which means that we will uphold an injunction only on “a strong and unequivocal showing” that such relief is necessary, Bechtel Petroleum, Inc. v. Webster, 796 F.2d 252, 253-54(9th Cir.1986).
The district court recognized that its equitable powers were circumscribed by the Anti-Injunction Act and held that the injunction was permissible under the second and third exceptions to the Act.[16] With respect to the second exception, the court concluded that the challenged portion of the jury verdict “directly interfere[d] with and seriously impair[ed its] ability to supervise, implement, enforce, construe, and interpret the class action settlement over which [it] retained exclusive jurisdiction.” In re Louisiana-Pacific, 234 F.Supp.2d at 1180. With respect to the third exception, the court reviewed Minnesota law and determined that the cases relied on by the trial court did not in fact authorize Lester to recover the cost to repair Inner-Seal Siding. Id. Because state law did not allow repair costs as damages, the court reasoned Lester had effectively acted as an agent for class members by “asserting damages claims that belonged to the end users.” Id. at 1177. Thus, the court concluded that the trial court, by submitting *843 “Lester’s damages claim for repair costs covered by the class action settlement to the jury for consideration,” had improperly permitted relitigation of issues resolved by the class settlement and allowed a special “subclass” to recover twice on the same claim. Id. at 1180. We address each of those exceptions in turn.[17]

Necessary in Aid of Jurisdiction Exception

The second exception to the Anti-Injunction Act authorizes injunctive relief “to prevent a state court from so interfering with a federal court’s eonsider-ation or disposition of a case as to seriously impair the federal court’s flexibility and authority to decide that case.”[18] Atlantic Coast Line, 398 U.S. at 295, 90 S.Ct. 1739. This exception “arose from the settled rule that if an action is in rem, the court first obtaining jurisdiction over the res may proceed without interference from actions in other courts involving the same res.” Alton Box, 682 F.2d at 1272. Although the second exception has since been expanded to include some in personam actions, it remains that an injunction is justified only where a parallel state action *844 “threatens to ‘render the exercise of the federal court’s jurisdiction nugatory.’ ”[19] Bennett, 285 F.3d at 806(quoting Winkler v. Eli Lilly & Co., 101 F.3d 1196, 1202 (7th Cir.1996)). Indeed, the general rule is still that “[wjhere a suit is strictly in personam ... there is no objection to a subsequent action in another jurisdiction, either before or after judgment, although the same issues are to be tried and determined[,] ... because [the subsequent action] neither ousts the jurisdiction of the court in which the first suit was brought, nor does it delay or obstruct the exercise of that jurisdiction, nor lead to a conflict of authority where each court acts in accordance with the law.”[20] Kline v. Burke Constr. Co., 260 U.S. 226, 232, 43 S.Ct. 79, 67 L.Ed. 226 (1922); see also Donovan v. City of Dallas, 377 U.S. 408, 412, 84 S.Ct. 1579, 12 L.Ed.2d 409 (1964).
The necessary in aid of jurisdiction exception is inapplicable here because the state court action did not threaten the district court’s jurisdiction over the Inner-Seal Siding litigation. By the time that the court issued the injunction, the Inner-Seal Siding class action had long since been resolved. Indeed, the district court had several years earlier approved the settlement and entered final judgment. Because the litigation was over, the state court action could not have interfered with the district court’s consideration or disposition of the class claims. Cf. Alton Box, 682 F.2d at 1271. Nor could it have interfered with the court’s continuing jurisdiction over the settlement. The membership of the class was fixed, the parties’ respective rights and liabilities were resolved, the settlement fund had been established and claims were being paid. Lester did not seek to join or undo the class, contest the payment of funds to class members or make a claim on the settlement fund. Although the state court litigation arose from the same facts as the class action, an “injunction cannot issue to restrain a state court action” simply because it involves “the same subject matter at issue before the federal court.” Id. at 1272; accord Bennett, 285 F.3d at 807. Instead, an injunction is “necessary in aid of’ the court’s jurisdiction only when it is required to preserve the court’s jurisdiction. See Atlantic Coast Line, 398 U.S. at 295, 90 S.Ct. 1739; Bennett, 285 F.3d at 806-07. Because the state court action did not seriously impair the district court’s flexibility and authority to decide the Inner-Seal Siding litigation or enforce the settlement agreement, an injunction was not necessary to preserve the court’s jurisdiction. See, e.g., Alton Box, 682 F.2d at 1271-73.
*845 The authority cited by the district court, Hanlon v. Chrysler Corp., 150 F.3d 1011 (9th Cir.1998), is not to the contrary.[21] In Hanlon, we upheld an injunction barring a federal class member from pursuing a state class action involving claims that were similar to those raised in a nationwide class action that was nearing resolution. 150 F.3d at 1025. The controversy in that case arose when various lawsuits were consolidated into one nationwide class action. Id. at 1018. Shortly thereafter, a preliminary settlement agreement was approved and notice was made to class members. Id. To protect the settlement process, the district court ordered that “[pjending final determination ... of the settlement[,] ... no member of the Settlement Class ... shall commence [a lawsuit involving] ... any of the claims described in the ... Settlement Agreement.” Id. In contravention of that order, a disaffected class member filed a state class action, through which he sought to represent himself and all similarly situated residents of the state. Id. at 1018-19. The district court enjoined the state proceedings. Id. at 1019.
We affirmed. We concluded that a temporary stay pending settlement of the nationwide class action was appropriate under the All Writs Act and the Anti-Injunction Act because concurrent state proceedings at such a sensitive stage in the federal proceedings would have threatened the jurisdiction of the district court. Id. at 1025. Although Hanlon did not elaborate, the decision clearly recognized that a competing state class action covering a portion of the federal class posed a significant danger to the delicate and transitory process of approving a settlement agreement, and thereby threatened the district court’s ability to resolve the litigation.[22]
We are not presented with similar concerns. Lester was not a class member and *846 did not seek to represent class members. Nor was the federal litigation at a sensitive stage in the process. The membership of the Inner-Seal Siding class and the terms of the settlement were approved and finalized long before the district court issued the injunction. Final judgment had been entered. There was nothing more for the district court to do in the class action, save to ensure that the terms of the settlement agreement were followed.[23] The state court action could not threaten the court’s jurisdiction over that process. Accordingly, the injunction cannot be sustained under the necessary in aid of jurisdiction exception.
The dissent maintains that our holding “disregards the provision of the settlement agreement and the district court order expressly retaining ‘exclusive and continuing’ jurisdiction over the enforcement of the settlement agreement.” Post at 868. Relying on our decision in Flanagan v. Arnaiz, the dissent suggests that “inclusion of such a provision ... provides a sufficient basis for the invocation of the ‘necessary in aid of jurisdiction’ exception.” Id. We are not persuaded that Flanagan stands for such a broad proposition. We agree with the dissent that the “exclusive and continuing” jurisdiction provision is important in the sense that without it (and the authority conveyed by the All Writs Act), the district court would have lacked subject matter jurisdiction over L-P’s motion to enforce the settlement agreement. See supra at 840-41. But that provision, standing alone, does not allow the district court to enjoin any proceeding it wants to enjoin. The power to halt a state proceeding is circumscribed by the Anti-Injunction Act. The necessary in aid of jurisdiction exception to that Act authorizes injunctive relief only when the “federal court’s flexibility and authority to decide [a] case” is “seriously impaired” by *847 a parallel state court proceeding. Atlantic Coast Line, 398 U.S. at 295, 90 S.Ct. 1739.
This limitation is actually illustrated by Flanagan, in which we ■ upheld an order permanently barring the plaintiffs from pursuing a state court action for breach of a prior settlement agreement. The issue in Flanagan arose when the plaintiffs settled a federal lawsuit against the defendants. 143 F.3d at 542. The settlement agreement effectively provided that the district court would retain exclusive jurisdiction for the purpose of resolving future disputes between the parties. Id. at 543. Less than a year after executing the settlement agreement, however, the plaintiffs filed a state court action against the same defendants for breach of the settlement agreement. Id. The state court stayed the proceedings, and the plaintiffs litigated their claims in the district court and on appeal to this Court. Id. The plaintiffs .lost on all but one count. Id. That claim was set for trial. Id. With discovery underway in the federal proceeding and a trial date set, the plaintiffs asked the state court to lift the stay. Id. Understandably exasperated, the district court enjoined the plaintiffs from pursuing the stayed action or any dther state court action alleging a breach of the settlement agreement. Id. at 543M4.
We affirmed. We observed that the plaintiffs had engaged in “an entirely unjustified attempt ... to evade their own agreement, incorporated in a court order and judgment, to submit disputes and enforcement proceedings regarding their settlement to the federal district court.” Id. at 546. Because the plaintiffs had agreed to maintain exclusive jurisdiction in federal court and their concurrent state court action threatened the district court’s jurisdiction over an ongoing case in which they were also parties, we held that the Anti-Injunction Act did not bar the stay. Id.
Unlike the vexatious litigants in Flanagan, Lester did not agree to retain exclusive jurisdiction in the district court. More importantly, the federal lawsuit was not winding its way to trial when the injunction was issued. Rather, the class action had achieved final judgment status more than six years before the jury returned a verdict in the Minnesota state case. The absence of an actual threat to an ongoing case renders the analogy to Flanagan unsound.

Relitigation Exception

The third exception to the Anti-Injunction Act, the so-called relitigation exception, permits a federal court to enjoin state proceedings when necessary “to protect or effectuate its judgments.” 28 U.S.C. § 2283. This power “allows federal courts to ... protect the res judicata effect of their judgments and prevent the harassment of ... federal litigants through repetitious state litigation.” Amwest Mortgage Corp. v. Grady, 925 F.2d 1162, 1164 (9th Cir.1991) (citation and internal quotation marks omitted). Because the relitigation exception is “founded in the well-recognized concepts of res judicata and collateral estoppel,” Chick Kam Choo, 486 U.S. at 147-48, 108 S.Ct. 1684, the “requirements of identity of the parties, ... adequate notice, and adequate representation apply,” Frank v. United Airlines, Inc., 216 F.3d 845, 853 (9th Cir.2000). In addition, an “essential prerequisite ... is that the claims or issues which the federal injunction insulates from litigation in state proceedings actually have been decided by the federal court.” Chick Kam Choo, 486 U.S. at 147-48, 108 S.Ct. 1684. This “prerequisite is strict and narrow.” Id. at 148, 108 S.Ct. 1684. Accordingly, a subsequent action may be barred only when “it arises from the same ‘transaction, or series of transactions’ as the original action [and w]hether two events *848 are part of the same transaction or series depends on whether they are related to the same set of facts and whether they could conveniently be tried together.” Western Sys., 958 F.2d at 871 (quoting Restatement (Second) of Judgments § 24(1), (2)). Rigorous application of res judicata principles ensures that the party sought to be precluded by the prior resolution of a claim or issue enjoyed a “ ‘full and fair opportunity’ to litigate ... in the earlier case.” Amwest Mortgage, 925 F.2d at 1164-65(quoting Allen v. McCurry, 449 U.S. 90, 95, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980)).
The relitigation exception is inapplicable here because the Minnesota lawsuit did not challenge the res judicata effect of the class settlement. Significantly, Lester was not named as a party to the class action and was not a member of the nationwide class.[24] Cf. Drelles v. Metro. Life Ins. Co., 357 F.3d 344, 346-47 (3d Cir.2003); Frank, 216 F.3d at 852-853. Nor were Lester’s interests sufficiently parallel to the class members’ interests such that privity could be implied.[25] Cf. Kerr-McGee Chem. Corp. v. Hartigan, 816 F.2d 1177, 1180-81 (7th Cir.1987). As a general rule, “one is not bound by a judg *849 ment in personam in a litigation in which he is not designated as a party or to which he has not been made a party by service of process.” Richards v. Jefferson County, 517 U.S. 793, 798, 116 S.Ct. 1761, 135 L.Ed.2d 76 (1996) (quoting Hansberry v. Lee, 311 U.S. 32, 40, 61 S.Ct. 115, 85 L.Ed. 22 (1940)). For that reason, “[a] judgment or decree among parties to a lawsuit resolves issues as among them, but it does not conclude the rights of strangers to those proceedings.”[26] Id. (quoting Martin v. Wilks, 490 U.S. 755, 762, 109 S.Ct. 2180, 104 L.Ed.2d 835 (1989)). As a stranger to the class proceedings and settlement and lacking privity with class members, Lester was entitled to sue L-P in state court for its own injuries. See id.; Drelles, 357 F.3d at 346-47; De Cosme v. Sea Containers, Ltd., 874 F.2d 66, 68 (1st Cir.1989); Alton Box, 682 F.2d at 1273.
L-P concedes that Lester was not precluded from litigating all claims related to the failure of Inner-Seal Siding. Nevertheless, L-P contends that the issue of damages for costs related to the repair of Inner-Seal Siding was litigated to finality in the class action and released by the settlement agreement. L-P reaches this conclusion by assuming that Lester, in bringing the repair cost claim, acted as a representative of its class member customers. By litigating injuries to its customers on behalf of its customers, so the argument goes, Lester should be treated like a class member for collateral estoppel purposes and precluded, as they would be, by the prior resolution of their claims.
According to the state trial court, however, the prayer for repair costs presented a cognizable state law claim belonging to Lester. As the distributor of a defective product, the trial court reasoned that Lester was entitled to recover the costs it would incur to make its customers whole. See, e.g., DeGidio v. Ace Eng’g Co., 302 Minn. 19, 225 N.W.2d 217, 223 (1974). Because the repair cost claim sought recovery of Lester’s damages, albeit voluntary and future damages, Lester was not acting as a representative of its customers seeking to recover on behalf of its customers. The claim was instead entirely personal to Lester. That claim could not have been resolved in the class action together with the class claims because Lester was neither a party to the class action nor represented by a party to the class action. See Western Sys., 958 F.2d at 871-72; Amwest Mortgage, 925 F.2d at 1164-65; De Cosme, 874 F.2d at 68; Alton Box, 682 F.2d at 1273. Because Lester did not have a “full and fair opportunity” to litigate its repair costs claim in the class action, that claim was not adjudicated and released by the class settlement. See Drelles, 357 F.3d at 346-47; De Cosme, 874 F.2d at 68; Alton Box, 682 F.2d at 1273; cf. Chick Kam Choo, 486 U.S. at 149, 108 S.Ct. 1684; Amwest Mortgage, 925 F.2d at 1164-65. *850 With an essential element of the relitigation exception lacking, the district court had no authority to enter the injunction. See Martin v. Wilks, 490 U.S. 755, 762, 109 S.Ct. 2180, 104 L.Ed.2d 835 (1989); Chick Kam Choo, 486 U.S. at 149, 108 S.Ct. 1684; Drelles, 357 F.3d at 346-47; Amwest Mortgage, 925 F.2d at 1165; Cratsenberg v. Owners of NW 20 Real Estate (In re Federal Shopping Way, Inc.), 717 F.2d 1264, 1270-71 (9th Cir.1983); Alton Box, 682 F.2d at 1273.
The district court’s invocation of the re-litigation exception was improper for the additional reason that any potential for relitigation of covered claims was addressed by the trial court’s instructions to the jury. Specifically, the trial court instructed the jury that Lester could not be awarded damages for injuries that were covered by the settlement. This instruction essentially gave L-P the legal ruling it sought and did not itself conflict with the federal court settlement.[27]
L-P was no doubt disappointed by the verdict returned. Whether Lester had adequately proven its claims presented a question of fact, however. The trial court left it to the jury, as the finder of fact, to assess damages according to detailed instructions. It is not the province of the district court in Oregon to say that the trial court and jury in Minnesota were wrong in their respective determinations. The proper recourse for L-P was to appeal through the state court system and, if necessary, to petition the United States Supreme Court for review. See Parsons Steel Inc. v. First Alabama Bank, 474 U.S. 518, 525-26, 106 S.Ct. 768, 88 L.Ed.2d 877 (1986); Atlantic Coast Line, 398 U.S. at 296, 90 S.Ct. 1739; cf. Drelles, 357 F.3d at 346-47. “[L]ower federal courts possess no power whatever to sit in direct review of state court decisions.” Atlantic Coast Line, 398 U.S. at 296, 90 S.Ct. 1739. Indeed, “the highly intrusive remedy of a federal-court injunction against the enforcement of [a] state-court judgment” is not justified even where a state court mistakenly rejects the res judicata effect of a prior federal judgment. Parsons, 474 U.S. at 525, 106 S.Ct. 768. Instead, “[challenges to the correctness of the state court’s determination as to the conclusive effect of a federal judgment must be pursued by way of appeal through the state-court system and certiorari from ... [the Supreme] Court.” Id.; accord Chick Kam Choo, 486 U.S. at 146, 108 S.Ct. 1684.
*851 L-P, of course, did appeal the verdict and certain rulings by the trial court through the state system. Hedging its bets, L-P also sought a federal injunction during the brief interval between the return of the jury verdict and entry of judgment. The district court agreed with L-P that Minnesota law did not permit Lester to recover the costs to repair Inner-Seal Siding and that the trial court had erred in submitting such a claim to the jury. That ruling was tantamount to a judgment , reversing a state court on a matter of state law. Cf. Atlantic Coast Line, 398 U.S. at 293, 90 S.Ct. 1739. Lower federal courts enjoy no such power. Parsons, 474 U.S. at 525-26, 106 S.Ct. 768. It is the sole responsibility of the state courts to determine whether state law allows a particular claim in a given dispute. See Erie v. Tompkins, 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). In failing to appreciate the state court’s right to decide issues of state law, the district court exacerbated the inherent conflict between federal and state courts.[28] See Chick Kam Choo, 486 U.S. at 146, 108 S.Ct. 1684. Indeed, allowing L-P to lose on the merits in state court, yet run to federal court for an injunction just days before the state court decision achieved preclusive status, offends the very “principles of equity, comity, and federalism” that undergird the Anti-Injunction Act.[29] See Parsons, 474 U.S. at *852 526, 106 S.Ct. 768; Ramsden, 214 F.3d at 870-71.
The case relied by on the district court, Flanagan v. Arnaiz, is not to the contrary. As discussed, Flanagan involved both a settlement agreement (and final judgment) and ongoing federal litigation for an alleged breach of that agreement. 143 F.3d at 543. As the dispute over the settlement agreement made its way to trial, the plaintiffs in the federal litigation asked a state court to resolve their breach of settlement agreement claim. Id. The district court ended their efforts. Id. at 544. We upheld the injunction under the relitigation exception because the first action had been decided in federal court and the parties had expressly agreed to maintain exclusive jurisdiction in federal court. Id. 546. The final judgment of a federal court and the accompanying settlement agreement were therefore threatened by a subsequent state court action that was brought by the very parties to the prior judgment. See id.
In contrast to the facts of Flanagan, Lester was not a party to the settlement agreement and was not bound by the provision placing exclusive authority in the district court. Moreover, the Minnesota action did not arise from the settlement agreement itself. Rather, Lester brought claims for its own injuries in the court of its choice, as it was entitled to do. A federal court does not have the power to prevent a plaintiff from pursuing a state law claim simply because that claim shares a common factual background with a claim litigated in an earlier case. There must be; as there was in Flanagan, the requisite nexus between the parties and claims or issues litigated in the first action and the parties and claims or issues sought to be precluded in the second action.[30]
The dissent expresses fear that our holding will “severely limit[] the authority of district courts to protect [their] jurisdiction and to preserve [their] settlement agreements ... [and] render[ ] federal court orders and judgments vulnerable to further litigation in state courts.” Post at 14604. Even if the dissent’s concerns were valid, the authority of federal courts is not unlimited. In any event, we do not perceive such broad dangers. We recognize that others in Lester’s position, encouraged by the jury verdict, may pursue similar claims if the laws of their respective states so allow and if the *853 respective statutes of limitations have not expired. But a release of claims by distributors was not a benefit that L-P bargained for in the settlement agreement. We simply hold that a plaintiff, who was not a party or in privity with a party to a prior federal action and who asserts claims that were not resolved in the pri- or action, is not precluded from litigating its state law claims in state court. This holding is entirely consonant with established law and faithfully allows the settlement agreement to shape the scope of our ruling: parties who agreed to the settlement and released their claims remain bound. On the other hand, claimants like Lester, class plaintiffs who opted out of the settlement or the plaintiffs in the class action in Florida, who were never part of the underlying action, may litigate their claims in accordance with the laws of their respective states.[31]
V. Conclusion
For the foregoing reasons, the order enjoining the Minnesota court from entering judgment on the $11.2 million in damages awarded to Lester for repair costs violates the Anti-Injunction Act. The injunction is vacated.
REVERSED.

. The settlement agreement required L-P to make a minimum payment of $275,000,000 into a settlement fund. Qualified claims were paid from that fund and class members were barred from litigating any claim related to the failure of Inner-Seal Siding for a period of four years from the date of the final order and judgment. After the expiration of the fourth year, the settlement agreement gave L-P the option of funding the remaining unpaid claims, if any. If L-P agreed to fund the outstanding claims, all class members remained bound by the agreement for another year. If L-P elected not to fund the outstanding obligations, the settlement terminated with respect to unfunded claims, leaving those class members free to pursue new lawsuits against L-P. This annual reevaluation of remaining claims continued until the end of the seventh year, at which time the claims administrator was ordered to notify L-P if the settlement fund proved insufficient to satisfy all approved claims filed before January 1, 2003. Within 60 days of notification, L-P was directed to advise class counsel whether it intended to satisfy the unfunded claims. If *835 L-P agreed to fund the remaining claims, it was required to make additional payments "at the end of each of the next two 12-month periods or until all claims [were] paid in full.” Satisfaction of the "final funding” obligation bound all class members "for an additional 24-month period.” On the other hand, if L-P determined not to fund the outstanding claims, all class members whose claims remained unsatisfied for a period of 90 days were authorized to "pursue whatever legal remedies [were] available to them without regard to the release.”
Because of the large number of claimants, LP and class counsel, with approval of the special master overseeing the settlement, created several alternative procedures through which class members, at their election, could receive compensation ahead of schedule but at a discounted rate. None of the alternative compensation procedures in any way modified or changed the original settlement agreement.

. All members of the "Settlement Class” were "barred and permanently enjoined from prosecuting 'Settled Claims’ ... against L-P.” The "Settlement Class” was defined as "all Persons who have owned, own> or subsequently acquire Property on which Exterior Inner-Seal Siding has been installed prior to January 1, 1996.” The settlement agreement excluded claimants who timely requested exclusion from the class and claimants who were members of a certified class action in Florida titled Anderson v. Louisiana Pacific Corp., No. 94-2458-CA-01. A "Settled Claim” was defined as
any claim, ... damage, loss or cost, action or cause of action, of every kind and description that the Releasing Party has or may have, whether known or unknown, asserted or unasserted, latent or patent, that is, has been, could reasonably have been or in the future might reasonably be asserted by the Releasing Party either in the Action or in any other action or proceeding in this Court or any other court or forum, regardless of legal theory, and regardless of the type or amount of relief or damages claimed, against any of the Defendants, arising from or in any way relating to any defects or alleged defects of Exterior Inner-Seal Siding, or any part thereof.

. This figure includes claims that were satisfied through the alternative funding procedures, see supra at 834-35 n. 1, which afforded claimants an opportunity to receive *836 discounted payments on an accelerated basis in order to minimize delay and uncertainty. According to the special master's report dated November 17, 2003, only $18.1 million in valid, approved claims remained unfunded as of the end of the claims period. L-P has also agreed to fund those claims.

. The parties filed portions of the trial transcript with the district court. On appeal, Lester offered additional portions of the transcript that were previously unavailable and asked that we take judicial notice of the same. We grant the request. See Fed.R.Evid. 201.

. The record does not reflect the actual number of Lester customers who filed claims under the settlement or the amount that each customer received in relation to their submitted claims. Two of Lester’s customers testified at trial that recovery under the settlement was about 30% of repair costs.

. Subsection (b) was likely included to reflect the exception in the settlement agreement for claims for siding failures that occurred after January 1, 2003. Subsection (c) may have followed from Lester’s argument that if L-P refused to fund the remaining claims, Lester would be entitled to damages for repair costs. Although L-P subsequently committed to funding the remaining claims, the dates referred to in subsections (b) and (c) were still in the future at the time the instructions were given to the jury. Thus, the jury was, in effect, asked to anticipate the future, which might help to explain the verdict that it reached.

. Questions 8 and 9 of the completed verdict form provided:
8.What amount of money would fairly compensate Lester?
Cost of Inner-Seal:
Cost to Repair Buildings (those not barred by the class action):
Lost Profits:
Cost to Restore Goodwill: Total:
$3.4 million
$13.2 million $10.2 million $ 2.8 million $29.6 million
9.Without regard to the class action, what is the total amount of money that would fairly and adequately compensate Lester for the Cost to Repair Buildings (both those in and out of the class action)?
$13.2 million

. Such a stay allows for the resolution of any post-trial motions without the need to reopen judgment if relief is granted. See Minn. R. Civ. P. 58.01 cmt; id. 58.02.

. The court reached this amount by subtracting $2 million — the cost to repair and replace siding on buildings constructed after January 1, 1996 — from the $13.2 million awarded as the total repair and replacement damages. In re Louisiana-Pacific, 234 F.Supp.2d at 1174.

. This point was made explicit during the hearing on L-P’s motion for injunctive relief, where the district court opined that "the judge in Minnesota ... did wrong. The ... hog barn damage [claims] of people within a class should never have been submitted to that jury. That was wrong in every respect.” In its order granting the injunction, the court confirmed its conclusion that "the Minnesota state court was wrong to submit Lester’s damages claim for repair costs covered by the class action settlement to the jury for consideration.” In re Louisiana-Pacific, 234 F.Supp.2d at 1180.

. The court reasoned that absent the injunction Lester was entitled to recover $31,375,862.21. That figure was calculated by adding the original jury verdict of $29.6 million, plus $1,519,811 in pre-verdict interest, $189,255 in post-verdict interest and $66,796.21 in costs and disbursements, and subtracting the portion of the verdict enjoined by the district court, $11.2 million, and $101,438 in interest on that amount.

. In addition to its argument that the district court lacked subject matter jurisdiction, Lester contends that it was not subject to the district court’s equitable powers because it was not properly served and lacked the requisite minimum contacts with the forum state. The improper service portion of Lester’s argument is easily resolved. Lester had actual knowledge of the proceedings through a mailed copy of L-P's motion to enforce the class settlement. That gave Lester an opportunity to appear and oppose the motion. Lester accepted the opportunity, appeared before the district court and contested the legality of the injunction. Nothing more was required to protect Lester and its interests. See, e.g., In re Baldwin-United Corp., 770 F.2d 328, 340 (2d Cir.1985). We do not separately discuss the issue of minimum contacts, however. Although personal jurisdiction is ordinarily determined at the outset as a threshold matter, in this case that issue is inexorably intertwined with the merits. If the state court action threatened the jurisdiction of the district court or implicated the res judicata effect of the settlement agreement, Lester would be subject to the jurisdiction of the district court in Oregon, as the court with continuing jurisdiction over the settlement. On the other hand, if the state court lawsuit did not affect the settlement or the district court’s jurisdic *841 tion over the same, the connection between Lester and the forum state would be more tenuous. Because we conclude that the district court lacked the power to enjoin the state court proceedings, we need not examine whether the district court had the power to enter a binding order against Lester.

. We reject Lester's implied collateral attack on subject matter jurisdiction over the class action itself. See, e.g., Snell v. Cleveland, Inc., 316 F.3d 822, 827 (9th Cir.2002).

. As the Second Circuit explained in In re Baldwin-United, the authority retained by a district court in a settlement agreement and order that provides for continuing and exclusive jurisdiction, in conjunction with the All Writs Act, conveys subject matter jurisdiction to protect a prior judgment from threats by parties and nonparties alike. See 770 F.2d at 338.

. In addition to its arguments under the Anti-Injunction Act, Lester maintains that the injunction violated the Full Faith and Credit Act, its due process rights and the Rooker-Feldman doctrine and further contends that L-P was not entitled to an injunction because it had an adequate remedy at law and failed to show irreparable harm. Because we hold that the injunction cannot be sustained under the Anti-Injunction Act, we do not reach Lester’s other contentions.

. The first exception to the Anti-Injunction Act, which allows an injunction where “expressly authorized by Act of Congress,” is not at issue here.

. The dissent suggests that we have "conducted a de novo review of the factual findings underlying the district court's decision to issue the injunction under the second exception and substitutedfour] judgment for that of the district court." Post at 859. The dissent is only partially correct. As our caselaw explains, we must “review the legal determination of whether the district court had the power to issue an injunction de novo.” Continental Airlines, Inc. v. Intra Brokers, Inc., 24 F.3d 1099, 1102 (9th Cir.1994). If we are satisfied that the district court had the authority to issue the injunction, we then examine "its decision to exercise that power ... for an abuse of discretion.” Western Sys., 958 F.2d at 867. In this case, we conclude as a matter of law that the district court lacked the power to enjoin the state court proceedings. That is not a matter of discretion.

. The dissent views the necessary in aid of jurisdiction exception and the relitigation exception as parallel provisions that authorize an injunction in essentially the same circumstances. Post at 866 ("From a pragmatic standpoint, the basic elements of the two exceptions are essentially the same.”). We are not inclined to construe the Anti-Injunction Act in that way, as it would render one of the exceptions redundant and the use of the disjunctive "or” in the statute irrelevant, in violation of the familiar canon that cautions against such a reading. See, e.g., Mackey v. Lanier Collection Agency & Serv., Inc., 486 U.S. 825, 837, 108 S.Ct. 2182, 100 L.Ed.2d 836 (1988). A distinction between the necessary in aid of jurisdiction exception and the relitigation exception has consistently been recognized in the caselaw. The former exception applies when a parallel state action “threatens to ‘render the exercise of the federal court's jurisdiction nugatory.' ” Bennett, 285 F.3d at 806. The latter exception, which was added in 1948, is used “to prevent state litigation of an issue that previously was presented to and decided by the federal court.” Chick Kam Choo, 486 U.S. at 147, 108 S.Ct. 1684.
The separate treatment of these provisions in the caselaw forces the dissent to concede that the necessary in aid of jurisdiction exception "is generally applied at an earlier stage of the litigation, before the settlement is fully implemented.” Post at 866. The dissent suggests that in "many of the cases in which an injunction has been affirmed under the relitigation exception, it has also been affirmed under the 'necessary in aid of jurisdiction’ exception.” Id. at 866. But the cases cited by the dissent represent exceptions explained by their particular facts. In Flanagan v. Arnaiz, 143 F.3d 540 (9th Cir.1998), for instance, we applied both exceptions because there was both a final settlement agreement (and judgment) and an ongoing action in the form of litigation over an alleged breach of that settlement agreement. Id. at 543-44. The validity of an injunction will more often depend on one exception or the other. Compare In re Diet Drugs, 282 F.3d 220, 233 (3d Cir.2002) (applying the necessary in aid of jurisdiction exception because the federal action had not reached final judgment), with Amalgamated Sugar Co. v. NL Indus., Inc., 825 F.2d 634, 639-640 (2d Cir.1987) (applying the relitigation exception because the federal action had reached final judgment).

. The dissent offers an exactly converse definition of the scope of the necessary in aid of jurisdiction exception. According to the dissent, the " 'necessary in aid of jurisdiction' exception is inapplicable only when the district court's jurisdiction has been so completely exhausted that the intrusion by a state court on its exercise of its jurisdiction would be meaningless.” Post at 867. No authority is cited to support that reading of the caselaw, and we remain bound by precedent.

. According to the dissent, we are mired in the law as it was in 1922 and refuse to accept that the necessary in aid of jurisdiction exception has been used in in personam actions. Post at 869. The dissent is mistaken. We acknowledge that the necessary in aid of jurisdiction exception has been applied in in personam actions, though as a limited exception to the rule. Supra at 843. We also acknowledge that some courts have rationalized the expansion of the necessary in aid of jurisdiction exception by comparing the jurisdiction of a multidistrict court in a complex class action to a res. See, e.g., In re Baldwin-United, 770 F.2d at 337. We offer no comment on the validity of such a comparison. We simply hold that however one views the class action proceedings in this case, application of the necessary in aid of jurisdiction exception is not supported by established law.

. The district court also quoted extensively from the Second Circuit's decision in In re "Agent Orange" Product Liability Litigation, 996 F.2d 1425 (2d Cir.1993). In that case, the court held that "[a] district court, in exceptional circumstances may use its All Writs authority to remove an otherwise unremova-ble state court case in order to 'effectuate and prevent the frustration of orders it has previously issued in its exercise of jurisdiction otherwise obtained.’ ” 996 F.2d at 1431(quoting United States v. New York Tel. Co., 434 U.S. 159, 172, 98 S.Ct. 364, 54 L.Ed.2d 376 (1977)). As noted by the district court in its order, the Supreme Court in Syngenta Crop Protection, Inc. v. Henson, 537 U.S. 28, 123 S.Ct. 366, 154 L.Ed.2d 368 (2002) held that the removal statute "requires that a federal court have original jurisdiction over an action in order for it to be removed from a state court. The All Writs Act, alone or in combination with the existence of ancillary jurisdiction in a federal court, is not a substitute for that requirement.” 537 U.S. at 34, 123 S.Ct. 366. Accordingly, the In re "Agent Orange" rule, which was never adopted by this Circuit, is no longer instructive.

. In this way, Hanlon tracks the Third Circuit's decision in In re Diet Drugs, in which the court affirmed an order enjoining a parallel state action. Our dissenting colleague relies on In re Diet Drugs for the proposition that the complexities of a nationwide class action justify application of the necessary in aid of jurisdiction exception. Post at 869. The dissent overlooks one critical aspect of In re Diet Drugs, however. In that case, as in Hanlon, the federal nationwide class action was nearing settlement at the time the state action was filed. 282 F.3d at 237. In light of the sensitive stage of the federal litigation, the Third Circuit reasoned that the state court action "might interfere with the District Court's oversight of the settlement at that time, given the careful balancing it embodied” and, therefore, posed "a serious threat to the District Court’s ability to manage the final stages of this complex litigation.” 282 F.3d at 236-37, Here, the prior (not parallel) federal class action resulted in a settlement and final judgment nearly four years before Lester filed the state action and over six years before the jury returned its verdict.

. The dissent contends that the federal class action remained active and that to reach a contrary result we have improperly "disagree[d] with the district court’s statement of the relevant facts” and made "erroneous findings of fact” on appeal. Post at 867. Two of the three "facts” that we assertedly ignore, however — that allowing Lester to collect on its repair cost claim will lead to double recovery for some class members and cause other distributors to seek damages “on behalf of customers,” post at 866 are not factual findings. The first is a legal conclusion and the second is speculation, which the district court failed to connect to the evidence before it or to the fact of how that would threaten its jurisdiction. We do not owe deference to such matters.
Furthermore, the dissent is mistaken about the relevance of L-P’s decision to fund claims and the possible effect of the state court action on that decision. By the time the district court enjoined the state proceedings, L-P had already agreed to fund the remaining claims through the seventh year. The sole question was whether L-P would make the "final funding” obligation, which would last until all outstanding claims were paid. See In re Inner Seal Siding Litigation, 234 F.Supp.2d at 1172-73. Lr-P, after the state jury verdict, answered that question and elected to fund all remaining claims. Accordingly, the jury verdict only had the potential to influence L-P’s final funding decision and, ultimately, did not even affect that issue. Moreover, even if LP's decision to fund the remaining claims had been influenced by the state court action, the requisite threat to the jurisdiction of the district court would still have been lacking. If L-P elected to fund the remaining claims (as it did), the claims administrator would continue paying approved claims. On the other hand, if L-P elected not to fund the additional claims, members whose claims remained unsatisfied would be able to "pursue [any available] legal remedies.” Id. This process of evaluation and reelection to continue funding was agreed to long before Lester brought the state court action. The parties knew that at some point L-P might decide not to fund the remaining claims. The coming to pass of a result that the parties themselves contemplated and provided for in their agreement cannot legitimately be called a threat to the district court’s jurisdiction.

. The dissent attaches no legal significance to the fact that Lester was not a party to the class action. Post at 859-60 & 863. The relevance of that fact is difficult to avoid. The relitigation exception is "founded in the well-recognized concepts of res judicata and collateral estoppel." Chick Kam Choo, 486 U.S. at 147-48, 108 S.Ct. 1684. Central to the concepts of res judicata and collateral estoppel is the principle that only parties to a prior action and parties in privity with parties to a prior action are barred from relitigating claims or issues in a subsequent action. Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg’l Planning Agency, 322 F.3d 1064, 1081 (9th Cir.2003); Frank, 216 F.3d at 853. Thus, the fact that Lester was not a party to the prior action leaves only the possibility of privity with class members as a basis for applying the relitigation exception. See, e.g., Amalgamated Sugar, 825 F.2d at 640.

. Relying on our decision in Trevino v. Gates, 99 F.3d 911 (9th Cir.1996), the dissent contends that Lester and its class member customers were in "virtual” privity because Lester, "[i]n essence, ... sought to serve as a conduit for its customers by obtaining additional damages on their behalf.” Post at 864. We disagree. In Trevino, we found sufficient privity of interest between a child and her grandmother with respect to the narrow issue of the amount of punitive damages to be awarded for the wrongful death of the child's father because the issues and the interests of the parties in the separate actions were "identical” and the child and her grandmother enjoyed "a familial relationship,” which was "an important factor” in finding privity. 99 F.3d at 933-34. Trevino is readily distinguishable. For starters, there was no familial or legal relationship, express or implied, between Lester and its class member customers, and Lester did not control the class members in the prior action or succeed to the class members' interests. Moreover, Lester’s interests and the interests of its class-member cus-, tomers were similar only in the limited sense that both Lester and its customers wanted the buildings constructed with Inner-Seal Siding to be repaired. Cf. Kerr-McGee Chem., 816 F.2d at 1180-81. According to Lester, however, moral obligations and business realities compelled it to repair the damaged buildings with or without compensation from L-P. Lester was also motivated to repair the defective siding by a desire to rehabilitate its tarnished image and rebuild its goodwill. From Lester's perspective, then, the repair costs claim was far more about making itself whole than reimbursing customers. Cf. Frank, 216 F.3d at 852-53; Kerr-McGee Chem., 816 F.2d at 1180-81. Lester's financial and imagerelated concerns were obviously not represented by the class members in the prior action. Cf. Frank, 216 F.3d at 852-53; Kerr-McGee Chem., 816 F.2d at 1180-81. Finally, the issues litigated in the two actions are not "identical.” In the federal action, the class members sued and recovered for their injuries, while Lester, in the state court action, sued and recovered for its injuries. The mere fact that both injuries have the same root'— defective Inner-Seal Siding — does not mean that both issues are identical.

. The dissent relies on the Second Circuit’s decision in In re Baldwin-United for the proposition that a nonparty can be bound by a prior judgment, even if it was not in privity with a party to the earlier action and did not have an opportunity to litigate its claims or seek redress for its injuries. Post at 862 & 863-64. Although we do not read In re Baldwin-United as announcing such a sweeping rule, we need not recount that opinion in detail. The short rebuttal is that the Anti-Injunction Act was not at issue in In re Baldwin-United. The parties to that action conceded that "the Anti-Injunction Act [was] inapplicable ... since the injunction below was issued before any suits were commenced in state court.” 770 F.2d at 335. Although the court looked to caselaw interpreting the Anti-Injunction Act for guidance, it was not constrained by the strict requirements of the relit-igation exception. We are not so unconstrained. See, e.g., Atlantic Coast Line, 398 U.S. at 287, 90 S.Ct. 1739(explaining that the exceptions provided in the Anti-Injunction Act should not "be enlarged by loose statutory construction”).

. There may be some tension between the trial court’s conclusion that state law allowed Lester to recover for repair costs and the instruction barring the recovery of such damages if the buildings involved were covered by the class settlement. If so, that is a matter for the state courts to resolve. It remains that the trial court instructed the jury that Lester's repair costs claim was barred under the settlement unless the building at issue had been constructed after January 1, 1996, has or may have a siding performance failure after January 1, 2003, or was one for which claims would be submitted prior to January 1, 2003 but not paid by the settlement fund. These limitations were derived from the class action settlement itself.
Similarly, while it may be difficult to reconcile the jury instructions and the verdict that none of the repair costs were barred by the settlement, we are not in a position to second guess the findings of the state court jury. On that subject, the trial court held that “both sides presented evidence as to what they believed [the] damage[s] for Inner-Seal should be. After a three-week trial, the jury returned a finding of damages in the total amount of $29.6 million which is supported by the evidence presented and this Court sees no reason to disturb the finding of the jury.” Though that explanation may not seem very persuasive or be very satisfying, we are not in a position to second-guess the Minnesota trial judge on the subject, either. Presumably that issue could be taken up with Minnesota’s appellate courts.

. According to the dissent, “whether or not Lester had a 'cognizable state law claim’ is inconsequential," because "[t]he jury awarded damages for the very same repair costs previously provided for in the settlement agreement and district court order.” Post at 861. The error in the dissent’s premise is similar to the mistake made by the district court when it concluded, contrary to the decision of the state trial court, that Minnesota law did not allow Lester to recover repair costs if its customers were members of the settlement class. In Re Louisiana-Pacific, 234 F.Supp.2d at 1177 ("I have studied [the cases cited by Lester and relied on by the state court] carefully and find them to be readily distinguishable and thus not controlling.”); id. at 1180 ("[T]he Minnesota state court was wrong to submit Lester's damages claim for repair costs covered by the class action settlement to the jury for consideration.”). While the dissent is far more thoughtful in its expression than the district court, the central premise is the same: the state trial court’s ruling and state jury’s verdict notwithstanding, Lester was not actually litigating claims for its own injuries; it was litigating claims for its customers’ injuries. The difficulty with that premise is that the trial court held that Minnesota law recognized Lester’s repair costs claim, and the jury returned a verdict stating that Lester, as a matter of state law, was entitled to the damages awarded. If we are to take seriously the rule that we do not sit in review of state court determinations, see, e.g., Parsons, 474 U.S. at 525-26, 106 S.Ct. 768, we must accept that Lester was not acting as a representative of its customers or as a conduit funneling money to its customers. We must accept that Lester was acting as a business, injured by LP and seeking to be made whole through its own claims for its own future damages, and that its damages were proven to the satisfaction of the jury. Perhaps the state trial court and jury were wrong in their respective determinations. A federal court, however, either explicitly as in the district court order or implicitly as in the dissent, is not in a position to say so.
In allowing the state court to resolve issues of state law for itself, we do not, as the dissent implies, disclaim our obligation to evaluate the propriety of the injunction ourselves. If we believed the issue in this case was as straightforward as the dissent suggests, we may well have come to a different conclusion.

. Although the trial court’s rulings and the verdict had not been reduced to a final judgment, the underlying issues, including the effect of the settlement agreement and the availability of repair costs, had been resolved by the trial court. Cf. Ramsden v. AgriBank, FCB, 214 F.3d 865, 869-70 (7th Cir.2000); De Cosme, 874 F.2d at 68-69. At some point, federal courts must accept that a state court action has progressed too far to warrant intervention, even if a technical prerequisite to final judgment remains. See Ramsden, 214 F.3d at 870-71.

. The cases cited by L-P are easily distinguishable. In the only binding precedent cited, Class Plaintiffs v. City of Seattle, 955 F.2d 1268 (9th Cir.1992), we upheld an anti-suit provision in a class action settlement agreement against attack by a group of settlement beneficiaries that had not individually approved the agreement because we determined that they were in privity with and adequately represented by their trustee, who had been a party to the settlement and was authorized to act for the beneficiaries. 955 F.2d at 1277-79. We reasoned that the Anti-Injunction Act did not bar the anti-suit provision because the district court was empowered to protect the settlement from attack by parties and parties in privity with parties to the settlement agreement. See id.
In contrast to Class Plaintiffs, the class members in the underlying action were not in privity with Lester and did not adequately represent Lester’s interests. Thus, Lester was not bound by the settlement. If Lester was not bound by the settlement, it follows that Lester's state law claims were not foreclosed by the settlement, even if those claims rested on some of the same facts involved in the class action.
The nonjurisdictional cases cited by L-P are of comparably little support. See In re Prudential Ins. Co., 261 F.3d 355, 366-68 (3d Cir.2001) (holding that a class settlement could bar future claims by class members, even though those claims were not raised by the class members in the original action); In re Baldwin-United, 770 F.2d at 335 (observing that "the parties agree that the Anti-Injunction Act is inapplicable here since the injunction below was issued before any suits were commenced in state court”).

. We should not lose perspective. The contested portion of the award is limited to the narrow issue of recovery for repair and replacement costs. L-P concedes, at least on appeal, that Lester had the right to bring its other claims. Nor should we assume that the Minnesota appellate courts will fail to correct errors, if any, that occurred in the trial court. "[A] federal court does not have inherent power to ignore the limitations of [the Anti-Injunction Act] and to enjoin state court proceedings merely because those proceedings interfere with a protected federal right or invade an area preempted by federal law, even when the interference is unmistakably clear.” Atlantic Coast Line, 398 U.S. at 294, 90 S.Ct. 1739. Accordingly, the "state proceedings 'should normally be allowed to continued unimpaired by intervention of the lower federal courts, with relief from error, if any through the state appellate courts and ultimately, [the Supreme] Court.' ” Choo, 486 U.S. at 146, 108 S.Ct. 1684 (quoting Atlantic Coast Line, 398 U.S. at 287, 90 S.Ct. 1739). That avenue remains open to L-P.